Oyster Shell Products Corporation, Inc. v. Commissioner. Arthur Ackerman and Evelyn Ackerman v. Commissioner. Gustaf A. E. Ackerman and Grace L. Ackerman v. Commissioner.
Oyster Shell Products Corp. v. Commissioner
Docket Nos. 65294-65296.
United States Tax Court
T.C. Memo 1961-323; 1961 Tax Ct. Memo LEXIS 28; 20 T.C.M. (CCH) 1668; T.C.M. (RIA) 61323; November 30, 1961
George Link, Jr., Esq., 711 Third Ave., New York, N. Y., and Charles H. Buckley, Esq., for the petitioners. Colin C. Macdonald, Jr., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in income tax for the year 1950 as follows: Oyster Shell Products Corpora-
tion, Inc.
$51,905.90
Arthur and Evelyn Ackerman
$28,154.24
Gustaf A. E. and Grace L.
Ackerman
$20,985.10
*29 The issues presented are (1) whether Oyster Shell Products Corporation, Inc. is subject to tax under section 102, I.R.C. 1939, as having been availed of during 1950 to prevent the imposition of surtax upon its two shareholders by permitting the earnings and profits to accumulate instead of being divided or distributed; and (2) whether amounts received as withdrawals on open accounts during 1950 are taxable income. Findings of Fact The facts stipulated are incorporated herein by reference. Arthur and Eveyln Ackerman are husband and wife and reside in Wilton, Connecticut. They filed their joint Federal income tax return for the year 1950 with the director for Connecticut. Gustaf A. E. and Grace L. Ackerman are husband and wife residing in Greenwich, Connecticut. Their joint Federal income tax return for 1950 was also filed with the director for Connecticut. Oyster Shell Products Corporation, Inc., hereinafter referred to as Oyster Shell, was a Louisiana corporation, organized July 12, 1920, with a home office at New Rochelle, New York. Its Federal income tax return for 1950 was filed on a calendar year accrual basis of accounting with the director for the 14th district of *30 New York. Since the organization of Oyster Shell in 1920, Arthur has held the offices of president and treasurer, and Gustaf, the offices of vice president and secretary. Together they constitute the only stockholders of Oyster Shell. Oyster Shell engaged in the business of converting reef oyster shell into various finished products at two plants located on opposite banks of the Atchafalaya River at Berwick and Morgan City, Louisiana. The plant at Morgan City was located on land held under long-term lease from Morgan City and other lessors. Manufacturing processes at this plant consisted of conversion of reef oyster shell into three principal lime products, namely, agricultural uncalcined lime, poultry feed, and laminar calcium. Large piles of crushed and washed shell and poultry feed were stored on the premises for future processing and shipment. The Berwick plant was located on land owned by Oyster Shell and the manufacturing process at the Berwick plant consisted of converting washed and crushed oyster shell obtained from the Morgan City plant into fine commercial uncalcined lime and laminar calcium. The original plant of Oyster Shell was located on part of its Berwick location *31 and most of the original buildings are still standing. All of the remaining facilities of Oyster Shell located in Berwick and Morgan City were constructed or acquired by purchase by Oyster Shell since its incorporation. The corporation's source of raw oyster shell is from reefs leased from the State of Louisiana and located in the Gulf of Mexico, approximately 15 miles south of the mouth of Atchafalaya Bay. From these reefs Oyster Shell dredged its raw shell and transported it to its plants in its own barges and tugs. Oyster Shell acquired land on the Harvey Canal near New Orleans as a possible plant site, but such a contemplated use was abandoned and the property was sold in 1953. In the general vicinity of Oyster Shell's plants at Berwick and Morgan City, the United States Army, Corps of Engineers, under due authority, planned and constructed a flood control project known as the Atchafalaya Basin Floodway as an integral part of the control system for managing floods on the Mississippi River. The Atchafalaya project consisted of guide levees placed east and west of the natural channel of the Atchafalaya River from its head at the Old River down to its mouth at the Gulf of Mexico. *32 The three intakes to this floodway were the natural intake from the Mississippi River through the Old River to the Atchafalaya, an uncontrolled overbank floodway to the west of the Atchafalaya the operation of which would be automatic by the natural overtopping of the levee whenever flood water rose sufficiently in height behind the levee, and a fully controlled gated structure to the east of the Atchafalaya called the Morganza Floodway. In addition to the natural outlet into the Gulf of Mexico an additional artificial oulet was constructed through Wax Lake. The initial planning of this project was in process in 1920 when Arthur and Gustaf located Oyster Shell on the banks of the Atchafalaya. Construction of this project commenced in August of 1929 at the head of the river and proceeded downstream toward Berwick and Morgan City. The levees were essentially complete down to the railroad property just above Oyster Shell's plants by 1945. Between 1945 and 1950 planning activities for the necessary types of floodwalls below Morgan City were conducted by the Army Engineers and by August 1950 plants were finalized to construct the floodwalls behind Oyster Shell's plants at Morgan City and *33 Berwick which were subsequently completed. Under the predetermined scheme of operations, the Morganza Floodway would become operative to divert water from the Mississippi River to the Atchafalaya whenever the discharge in the Mississippi rose in excess of 1,500,000 cubic feet per second below the latitude of Old River. Under such circumstances the gates of the floodway would be opened in a controlled manner to divert only sufficient waters to lower the discharge in the Mississippi to 1,500,000 cubic feet per second at the latitude immediately below the Morganza Floodway. To accomplish this purpose the Morganza Floodway was constructed so that the gates could be operated to start, stop or adjust the flow of water to the Atchafalaya in any manner required. The discharge in the Mississippi River has exceeded 1,500,000 cubic feet per second below the latitude of the Old River on the average of once every 20 to 30 years. Commencing in 1949, Arthur began negotiations with the Army Corps of Engineers, New Orleans District, concerning plans for the location and type of floodwalls to be constructed on the property of Oyster Shell as a part of the Atchafalaya Basin Floodway. Also included *34 in the negotiations was the amount of compensation to be paid to Oyster Shell as a result of the construction. By August of 1950 Arthur knew that the levees to be constructed would be located landward of both Oyster Shell plants and that the United States would pay him only for flowage easements resulting from the placement of the levees. Arthur refused to settle for the payment for flowage easements. On October 5, 1950, the United States of America instituted a condemnation proceeding in the United States District Court for the Eastern District of Louisiana to obtain a perpetual easement or servitude over sections of the land owned by Oyster Shell at Berwick and leased by it at Morgan City for flood control purposes in connection with the construction of the Atchafalaya Basin Floodway. On February 2, 1951, Oyster Shell filed an answer in this action and a counterclaim in the amount of $3,150,000. This counterclaim sought reimbursement for the asserted going concern value of Oyster Shell on the grounds that placing the levees behind the plants constituted a complete taking of all the property of Oyster Shell by the United States. Oyster Shell's contention did not prevail in the District *35 Court and on appeal the decision was affirmed by the United States Court of Appeals for the Fifth Circuit. A writ of certiorari was denied by the United States Supreme Court. Negotiations were then renewed by Arthur with the Army Engineers and a settlement for flowage easements over the Oyster Shell properties was effected. Oyster Shell has never declared a dividend to its stockholders during its corporate existence. The following is a schedule showing the yearly increases or decreases in the earned surplus of Oyster Shell from 1940 through 1950: Beginning
Increase or
Year
of Year
End of Year
(Decrease)
1940
$ 32,046.03
$ 63,712.11
$ 31,666.08
1941
63,712.11
116,541.05
52,828.94
1942
* 103,772.76
314,380.53
210,607.77
1943
314,380.53
418,397.30
104,016.77
1944
418,397.30
445,822.27
27,424.97
1945
445,822.27
425,256.80
(20,565.47)
1946
425,256.80
271,424.99
(153,831.81)
1947
* 325,321.35
830,870.62
505,549.27
1948
830,870.62
810,127.73
(20,742.89)
1949
810,127.73
739,078.15
(71,049.58)
1950
739,078.15
1,042,548.33
303,470.18
Oyster Shell *36 maintained on its books and records running accounts in the names of Arthur, Gustaf, and Argus Co., a co-partnership of Arthur and Gustaf. The withdrawals of Arthur and Gustaf were charged to these accounts and the accounts were credited with their salaries, repayments, and amounts expended on behalf of the corporation. For the period 1940 through 1950 the debit balances in these accounts were as follows: End of
Arthur
Gustaf A. E.
Argus
Year
Ackerman
Ackerman
Company
1940
$ 72,160.38
$ 79,737.48
1941
91,721.43
67,595.08
1942
110,363.17
71,480.30
1943
127,179.12
75,777.25
$14,150.00
1944
104,334.99
94,216.25
( 1,465.51)
1945
80,858.76
37,012.88
(11,915.51)
1946
78,947.63
26,424.51
20,634.49
1947
132,264.11
36,918.24
30,838.72
1948
218,644.07
67,431.03
47,138.72
1949
232,599.48
100,332.47
58,988.72
1950
262,647.17
124,510.87
85,788.72
In addition to the increase of $30,047.69 in his running acount Arthur also withdrew from Oyster Shell through the Argus Company, $18,599.36. Similarly, Gustaf whose running account increased by $24,178.40 in 1950 withdrew $14,216.73 from Oyster Shell through the Argus Company. No *37 interest was charged Arthur or Gustaf by Oyster Shell and no notes were executed with respect to the running accounts. None of the withdrawals was included as income by Arthur or Gustaf in their respective joint returns. Part of the proceeds of the withdrawals by Arthur and Gustaf was used by either or both of them to purchase stocks, bonds and futures in their individual names. All gains, losses, dividends and interest resulting from such transactions were reflected on their individual personal income tax returns. In 1950 the current assets of Oyster Shell included cash $332,793.38, receivables $121,094.02, and marketable securities $60,657. The total liabilities in 1950 were $246,251.18. Oyster Shell was legally dissolved on April 6, 1955 and its assets, including the running accounts, were distributed on liquidation to its shareholders on that date. Following the liquidation Arthur and Gustaf sold the Morgan City plant; however, they retained the Berwick plant which they continued to operate. On March 5, 1956, the Commissioner notified Oyster Shell pursuant to section 534, I.R.C. 1954, that he proposed to issue a statutory notice of deficiency with *38 respect to section 102, I.R.C. 1939. On April 2, 1956, Oyster Shell pursuant to the provisions of section 534, I.R.C. 1954, submitted to the Commissioner the following statement setting forth the facts upon which it relied to establish that none of its earnings had been permitted to accumulate beyond reasonable needs of its business: STATEMENT OF POSITION OF THE OYSTER SHELL PRODUCTS CORPORATION INC. IN ACCORDANCE WITH THE PROVISIONS OF SECTION 534 OF THE INTERNAL REVENUE CODE OF 1954 AS AMENDED BY SECTIONS 4 AND 5 OF THE PUBLIC LAW 367, 84TH CONGRESS, CHAPTER 805, FIRST SECTION Dear Mr. Rowland: - We respectfully submit the following statement of the grounds, together with the facts, to show the basis thereof upon which we rely to establish that all or any part of the earnings and profits of the Oyster Shell Productions [Products] Corporation, Inc. for the calendar year 1950, have not been permitted to accumulate beyond the reasonable needs of the business. The name and address of the taxpayer is the Oyster Shell Products Corporation, Inc., 271 North Avenue, New Rochelle, New York. The date and symbols are March 5, 1956 AP:NY:JAR:e The year involved *39 and the tax disputed - calendar year 1950, $48,372.82. This tax is based upon the finding that $154,215.12 of increase in the corporate surplus for the year 1950 constituted improper accumulation. This amount, added to the surplus was reasonable and proper by reason of the corporation's expansion and development and production requirements, the latter by reason of the location of our plant on both banks of the Mississippi River, being in constant danger of being completely or partially washed away by reason of the flood conditions which prevail along the Mississippi River and which the government has endeavored for many decades to dam, to create embankments for the purpose of preventing the destruction of plants located along the Mississippi River. We are a Louisiana corporation. FACTS There was submitted to the Revenue Agent in charge of this examination and also to the Group Chief, the Record on Appeal in the United States Court of Appeals, Fifth Circuit in the case of Oyster Shell Products Corporation, Inc. v. the United States of America, which contains the record of the proceedings instituted by the United States to condemn certain of the properties of this company for *40 the purpose of protecting the property immediately in the rear of the property of the Oyster Shell Products Corporation, Inc., leaving the property of the Oyster Shell Products Corporation, Inc. entirely subject to complete or partial destruction by reason of seasonable flood conditions prevailing along the Mississippi River. This condition was so imminent in the minds of the Oyster Shell Products Corporation, Inc. that it purchased some land with the object of rebuilding its plant on the location of such lands which would be removed from the dangers of the flood conditions prevailing along the Mississippi River. The records submitted show that the United States Government had been contemplating leaving the plant of the Oyster Shell Products Corporation, Inc. outside of the protective embankments which it built late in 1950. To transfer the plant of the Oyster Shell Products Corporation, Inc. to its new location, would cost in excess of one million dollars. The business of the taxpayer is the crushing of oyster shells. It is a very destructive operation to the machinery and equipment. The business of the Oyster Shell Products Corporation, Inc. was expanding and during the calendear *41 [calendar] year in question, the Oyster Shell Products Corporation, Inc. added capital and other improvements to its plant in the sum of $166,836.40. During the four years, 1950 to 1954, the capital expenditures of the Oyster Shell Products Corporation, Inc. amounted to $815,815.55. In 1954, the estimated cost of completing the expansion project amounted to approximately $410,000.00. The Oyster Shell Products Corporation, Inc. asks leave to file as a part of this statement, the transcript of the record on appeal in the action of the Oyster Shell Products Corporation, Inc., Appellant v. United States of America, Appellee, in the United States Court of Appeals, Fifth Circuit. It is respectfully urged that there is no justification for any claim that any part of the earnings and profits of the Oyster Shell Products Corporation, Inc. for the year 1950 have been permitted to accumulate beyond the reasonable needs of the business, and further, that the burden of sustaining any such claim must rest upon the government. Included with the statement was a copy of the record of Oyster Shell's appeal to the United States Court of Appeals for the Fifth Circuit. On September 25, 1956, the *42 Commissioner issued a statutory notice of deficiency to Oyster Shell in which he determined that Oyster Shell had been availed of during 1950 for the purpose of preventing the imposition of surtax upon its shareholders within the purview of section 102, I.R.C. 1939. In a statutory notice of deficiency issued to Arthur and Evelyn Ackerman, the Commissioner determined that they had realized dividend income in the amount of $48,647.05 from the withdrawal of funds from Oyster Shell. The Commissioner in a statutory notice of deficiency issued to Gustaf A. E. and Grace L. Ackerman determined that they also had realized dividend income as a result of the withdrawal of $38,395.13 from Oyster Shell. Opinion The first issue presented for decision is whether Oyster Shell was availed of during 1950 for the purpose of preventing the imposition of surtax upon its shareholders under section 102, 1939 Code. [1]
*43 The resolution of this question requires that we find the intent of the parties in control of the corporation. To make such a subjective determination it is necessary to consider carefully all the objective manifestations of their state of mind. Generally the pivotal question is whether the accumulation was dictated by the reasonable needs of the business. As the court observed in American Metal Products Corporation v. Commissioner, 287 F. 2d 860, 863 (C.A. 8, 1961), affirming 34 T.C. 89 (1960), "the real controversy * * * concerns the presence or absence of a valid business reason for accumulating earnings." If the earnings are found to have accumulated beyond the reasonable needs of the business, the statute, in section 102(c), creates a rebuttable presumption that the corporation was availed of for the purpose proscribed by the statute. In United Business Corporation v. Commissioner, 62 F. 2d 754, 755, the court commented with respect to this presumption that A statute which stands on the footing of the participants' state of mind may need the support of presumption, indeed be practically unenforceable without it, but the test remains *44 the state of mind itself, and the presumption does no more than make the taxpayer show his hand. It follows that the questions of whether the accumulations are in excess of the reasonable needs of the business and ultimately whether the corporation has been availed of to avoid imposition of surtax upon its shareholders are essentially questions of fact to be decided in light of all the evidence presented. American Metal Products Corporation v. Commissioner, supra. We have found as a fact that the Commissioner pursuant to section 534, I.R.C. 1954, [2] notified Oyster Shell that he proposed to issue a statutory notice of deficiency with respect to section 102, I.R.C. 1939. And within the prescribed time Oyster Shell submitted a statement, as shown in the findings of fact, to the Commissioner purporting to establish that none of the earnings had been permitted to accumulate beyond the reasonable needs of its business and thereby shift the burden of proof on that question to the Commissioner. Assuming that the statement complied with all the requirements of section 534 and that the burden of proof was shifted to the Commissioner, we conclude after *45 a careful study of the evidence, that the accumulation was not brought about by reasonable business needs, but conversely, that the dominant purpose for the accumulation was to avoid the imposition of surtax upon Arthur and Gustaf. *46 This Court when considering whether the accumulation was motivated by reasonable needs of the business has expressed the view that we are hesitant to revaluate the decisions of management or "attribute a sinister or ulterior motive to the corporation." Crawford County Printing & Publishing Co., 17 T.C. 1404, 1414 (1952). However, we will not hesitate to disregard the contention of reasonable business needs when the evidence shows that such contention was advanced merely as a veneer to conceal the true motive for the accumulation. In the statement it submitted pursuant to section 534, Oyster Shell maintained that its plants were "in constant danger of being completely or partially washed away" as a result of conditions that prevail along the Mississippi River and the funds accumulated were to be utilized to build a plant on land removed from the flood danger. We are of the opinion that the contemplated use for the accumulation asserted by Oyster Shell in the statement was conjured up when it was apprised of the Commissioner's intention to impose the section 102 surtax. In ascertaining the validity of a claim of reasonable business needs, "Definiteness of plan coupled *47 with action toward its consummation are essentials." Dixie, Inc. v. Commissioner, 277 F. 2d 526, 528 (C.A. 2, 1960), affirming 31 T.C. 415 (1958). At first blush it appears that the accumulation satisfied these essentials in the instant case as a possible plant site was acquired which would seem to indicate "action toward [the] consummation" of an existing plan to build a new plant. However, the evidence negates this outward appearance and reveals that Oyster Shell never intended to appropriate the accumulated funds to the building of a new plant. This conclusion is premised on our belief that any plans that had been formulated to build at another location were contingent upon a substantial recovery from the Government. This thesis is substantiated by Arthur's testimony at the trial. A colloquy between Arthur and counsel for the Commissioner with respect to moving the plant to the Harvey Canal property was as follows: Q. Now, did you expect to relocate the whole of your plant on that property? A. If I could have made a deal with the Army, yes. * * *
Q. Did you foresee making a dollar on this piece of real estate? A. I had no idea of selling *48 it, if I could have made a deal with the Army Engineers. Such a conclusion is further buttressed by,he fact,hat,he Harvey Canal property which was to be the site of the new plant was sold when it became apparent that a substantial recovery would not be forthcoming. Arthur also testified that Oyster Shell had experienced flooding at its plants resulting in temporary cessation of operations as far back as 1927. Although it is asserted that the new floodway would increase the severity of future floods, such a consideration did not seem to deter Oyster Shell in years subsequent to the year at issue from expending large amounts at the plant sites at Morgan City and Berwick as part of an expansion project. In addition, after Oyster Shell was liquidated and the Morgan City plant sold, Arthur and Gustaf continued to operate the Berwick plant even though it purportedly was "in constant danger of being completely or partially washed away." Having found that the accumulation exceeded reasonable business needs, we proceed to the ultimate question of whether Oyster Shell was availed of for the interdicted purpose, with the burden upon Oyster Shell to prove by a clear preponderance of the evidence *49 that even though the accumulation exceeded reasonable business needs it was not availed of to avoid the surtax. Our findings show that Oyster Shell had never declared a dividend to its shareholders during its corporate existence. However, both Arthur and Gustaf maintained running accounts on the books of Oyster Shell. They characterized their withdrawals as "loans" although no notes were executed or interest paid by either Arthur or Gustaf. In addition, money was extracted through Argus Co., a partnership composed of Arthur and Gustaf. The Regulations, 29,102-2 state that "Dealings between the corporation and its shareholders, such as withdrawals by the shareholders as personal loans" should be considered in resolving whether there has been an improper accumulation. Similarly in United Business Corporation v. Commissioner, supra, the court said, at page 755, that "loans are incompatible with a purpose to strengthen the financial position of the [corporation], but entirely accord with a desire to get the equivalent of * * * dividends under another guise." In the instant proceedings it has been stipulated that part of the proceeds of the withdrawals was used by Arthur *50 and Gustaf to purchase stocks, bonds, and futures in their individual names. However, they contend that they were acting for the corporation and the procedure employed was merely to expedite the security transactions. As we view it, there is a more obvious benefit arising from such an arrangement, namely, it afforded Arthur and Gustaf an opportunity continually to dip their hands into the corporate pocket-book and reap personal gains from the utilization of corporate funds. A similar factual situation confronted this Court in Kerr-Cochran, Inc., 30 T.C. 69, 83 (1958) where one shareholder who owned 213 out of the 219 shares outstanding had ready access to the corporation's funds for his personal use and he repeatedly availed himself of such funds for ventures completely unrelated to the corporation's business. No dividends were distributed by the corporation and we found that "this failure to pay dividends resulted in pronounced tax savings." Continuing, we stated that Obviously, by permitting the earnings and profits of the [corporation] to remain intact, [the shareholder] was able to carry on his personal ventures with [corporate] funds, unreduced by personal *51 income taxes. With the [corporation's] funds so readily accessible for [the shareholder's] personal needs, it was immaterial to [the shareholder] economically speaking, that the [corporation] did not declare dividends. As shown in the findings of fact, Oyster Shell during the year at issue had cash sufficient to satisfy all its liabilities and, not including its "loans" to Arthur and Gustaf, its liquid assets (cash, receivables, and marketable securities) exceeded total liabilities by a ratio of 2 to 1. We realize that closely held corporations, such as Oyster Shell are restricted insofar as their access to the money market is concerned and as a result the accumulation of earnings is an important source of funds for growth and expansion. Crawford County Printing & Publishing Co., supra.However, when the evidence discloses, as we think it does in this case, that the accumulation exceeded reasonable business needs and the funds were made available to the shareholders for their personal ventures, the corporation has been availed of to avoid the imposition of surtax upon its shareholders and the section 102 surtax should be imposed. Dixie, Inc. v. Commissioner, supra; *52 Kerr-Cochran, Inc., supra; American Metal Products Corporation v. Commissioner, supra; I. A. Dress Co., 32 T.C. 93 (1959), affd. 273 F. 2d 543 (C.A. 2, 1960); Barrow Manufacturing Co. v. Commissioner, 294 F. 2d 79 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court. Compare Crawford County Printing & Publishing Co., supra; Breitfeller Sales, Inc., 28 T.C. 1164 (1957). The remaining issue for decision is whether the withdrawals on open accounts during 1950 constituted dividends to Arthur and Gustaf. [3]
*53 The question is primarily factual to be resolved after an examination of all the attendant facts and circumstances. Wiese v. Commissioner, 93 F. 2d 921 (C.A. 8, 1938), cert. den. 304 U.S. 562 (1938); Victor Shaken, 21 T.C. 785 (1954). A review of the evidence in the case before us shows that Arthur and Gustaf had absolute control over the corporate affairs of Oyster Shell. Both maintained running accounts on the books of Oyster Shell and during the year at issue Arthur's account increased by the amount of $30,047.69 and Gustaf's account increased by $24,178.40. Additional amounts of $18,599.36 and $14,216.73 were withdrawn by Arthur and Gustaf respectively through their partnership, Argus Co. With respect to these withdrawals no notes were executed, no interest was paid and no specific date for repayment was set. Oyster Shell never declared a dividend during its corporate existence and when it was dissolved in 1955 the running accounts were part of the assets distributed in liquidation to Arthur and Gustaf. Although it was stipulated that the running accounts were credited with Arthur and Gustaf's salaries, repayments, and amounts expended *54 on behalf of the corporation, we do not believe this is sufficient to establish the existence of a bona fide debt. As we said in Ben R. Meyer, 45 B.T.A. 228, 240 (1941): The fact that the payments, including payments designated as "interest", made to Limited by petitioners were credited on their respective accounts on Limited's books is not persuasive evidence that the withdrawals constituted debts of the petitioners. In all of the taxable years, except 1934, the withdrawals by each petitioner exceeded the amounts paid by such petitioner to Limited and the net result in each of those years was that the debit balance of the account of each petitioner was not reduced, but the total net withdrawals steadily increased from year to year. The fact that the withdrawals were not treated as dividends by Oyster Shell but instead recorded on its books as loans and advances has little significance. In reply to such contention in Clark v. Commissioner, 266 F. 2d 698, 711 (C.A. 9, 1959) the court said: To constitute a distribution taxable as a dividend, the benefit received by the shareholder need not be considered as a dividend either by the corporation or its shareholders, *55 declared by the board of directors, nor other formalities of a dividend declaration need be observed, if on all the evidence there is a distribution of available earnings or profits * * * without any expectation of repayment. In Spheeris v. Commissioner, 284 F. 2d 928, 931 (C.A. 7, 1960) the Court of Appeals on similar facts held the withdrawals to be dividends saying that: Numerous objective facts support this conclusion: none of the withdrawals was evidenced by promissory notes or secured by collateral; no interest was charged or paid; no dates for repayment were set and the single repayment came after the instant proceedings were initiated; no dividends were declared, but withdrawals were taken from the closely-controlled corporation as Spheeris and his family needed funds; * * * A portion of the withdrawals was invested by Arthur and Gustaf in stocks, bonds, and futures and they contend that these investments were made on behalf of the corporation and were taken in their individual names merely to facilitate the brokerage transactions. However, the evidence shows the gains, losses, interest, and dividends from such transactions were reported by Arthur and Gustaf *56 on their returns and we are unable to find that any real benefit accrued to the corporation. We do not think the evidence presented by Arthur and Gustaf is sufficient to rebut the presumption of correctness which attaches to the Commissioner's determination. Moreover, the record supports his determination that the withdrawals resulted in the realization of dividend income. Clark v. Commissioner, supra; Ben R. Meyer, supra; Spheeris v. Commissioner, supra; Regensburg v. Commissioner, 144 F. 2d 41 (C.A. 2, 1944) affirming a Memorandum Opinion of this Court, cert. den. 323 U.S. 783; William C. Baird, 25 T.C. 387 (1955); W. T. Wilson, 10 T.C. 251 (1948) affirmed on another issue 170 F. 2d 423 (C.A. 9, 1948). Decisions will be entered under Rule 50. Footnotes
*. Beginning balance differs from prior year closing balance.↩
1. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation * * * if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax * * *
(c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.↩
2. SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary. - Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. * * * (c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.↩
3. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. (I.R.C. 1939). (a) Definition of Dividend. - The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.↩