Carlos Marcello [1] v. Commissioner. Anthony Marcello and Jeannine Marcello v. Commissioner. Jacqueline Marcello v. Commissioner. Carlos Marcello and Jacqueline Marcello v. Commissioner. Marcello v. Commissioner
Docket Nos. 3532-64 - 3534-64, 3744-65, 2908-66.
United States Tax Court
T.C. Memo 1969-193; 1969 Tax Ct. Memo LEXIS 107; 28 T.C.M. (CCH) 1011; T.C.M. (RIA) 69193; September 23, 1969, Filed. deQuincy V. Sutton Greater *109 Mississippi Life Bldg., Meridian, Miss., for the petitioners. William O. Lynch and Harold Friedman, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax under section 6653 (a)[2] as follows: Petitioner
Docket
Additions to Number
Year
Deficiencies TaxSe". 6653(a)
Carlos Marcello
3532-64
1960
$ 133,925.40
$ 6,696.27
Anthony and Jeannine Marcello
3533-64
1960
115,072.88
5,753.64
Jacqueline Marcello
3534-64
1960
133.925.39
6,696.27
Carlos and
3744-65 *1961
5,664.86
283.24 Jacqueline Marcello
2908-66
1962
41,691.29
2,084.56
* Respondent is seeking an increased deficiency of $546 and an increased addition to tax of $30 for the taxable year 1961, over and above the amounts shown above, pursuant to amended pleadings. Certain issues have been settled by the parties. The issues remaining for decision are as follows: Carlos and Jacqueline Marcello (1) What was the amount, if any, of taxable gain realized by petitioners from the sale of the Old Southport Club in 1960. (2) Whether petitioners *110 received taxable income in 1960, and if so in what amount, in connection with the so-called "John Cutrone transaction" involving the purchase and sale of the Elsie M. Churchill Tract and the capital stock of Churchill Farms, Inc., and Bayou Verret Land Co., Inc. (3) Whether during 1960 petitioners received constructive dividends in the amount of $21,675.94 from Jacqueline, Inc.
(4) Whether petitioners are entitled to deductions for unreimbursed business expenses claimed for 1960. (5) Whether petitioners are entitled to deductions for depreciation with respect to an automobile in the respective amounts of $1,250 and $1,500 for 1960 and 1962. (6) Whether petitioners are entitled to deductions for 1960 for rental expenses. (7) Whether the amount of $4,875.50, reported by petitioners for 1961 as payment for "damages" to the Elsie M. Churchill Tract, is taxable income to them. (8) Whether during 1962 petitioners received constructive dividends in the amount of $45,750 from Bayou Verret Land Co., Inc. (9) Whether during 1962 petitioners received constructive dividends *111 in the amount of $4,853 from Churchill Farms, Inc. (10) Whether petitioners understated petitioner Carlos Marcello's distributive share of the profits of the Town & Country Motel, a partnership, for 1960, 1961, and 1962. (11) Whether all or part of the underpayments of income tax due by petitioners for 1960, 1961, and 1962 was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). Anthony and Jeannine Marcello (12) What was the amount, if any, of taxable gain realized by petitioners from the sale of the Old Southport Club in 1960. (13) Whether petitioners are entitled to deductions for unreimbursed business expenses claimed for 1960. (14) Whether all or part of any underpayment of tax due by petitioners for 1960 was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). General Findings of Fact Petitioners Carlos Marcello and Jacqueline Marcello, husband and wife, were legal residents of Metairie, Louisiana, at the time their petitions were filed. They filed separate individual income tax returns for 1960 and joint income tax returns for 1961 and 1962 with the *112 district director of 1013 internal revenue, New Orleans, Louisiana. Louisiana is a community property state. Petitioners Anthony Marcello and Jeannine Marcello, husband and wife, were legal residents of Metairie, Louisiana, at the time their petition was filed. They filed their joint income tax return for 1960 with the district director of internal revenue, New Orleans, Louisiana. For convenience, each of the petitioners will usually be referred to herein by his given name. Carlos and Anthony are brothers. Issues 1 and 12. Sale of Old Southport Club Findings of Fact On July 22, 1960, Carlos and Anthony, Steve Quartano, Salvador A. Boemia, Sr., Guy Chivleatto, Jr., Benedetto Giaconia, and Anthony Trapani executed an act of sale conveying title to certain real estate and improvements known as the "Old Southport Club" (hereinafter Old Southport) to Riverside Drive Co., Inc. (hereinafter Estate's expenses and debts were fully paid, Riverside). The act of sale recites that Riverside was incorporated on July 7, 1960, and that it had agreed to pay the sellers $130,000 for Old Southport - $1,500 in cash and a note for the balance of $128,500, payable at the rate of $1,500 per *113 month. Respondent determined that a gain of $130,000, taxable as ordinary income in 1960, was realized on the sale by the community of Carlos and Jacqueline. In addition, respondent initially determined, inconsistently and alternatively, that Anthony and Jeannine realized joint income of $130,000 in 1960 on the same transaction. Respondent has now conceded that Anthony and Jeannine did not realize gain in excess of $16,250 and that such amount is taxable as long-term capital gain. The holdings of Carlos and Anthony in Old Southport stem from a 50 percent interest therein acquired by New Southport Realty Co., Inc., through an act of sale executed on August 31, 1949. As a result of the liquidation of New Southport Realty Co., Inc., on June 24, 1950, Carlos and Anthony each acquired one-fourth of that corporation's interest in Old Southport, i.e., a 12 1/2 percent interest in the property as a whole. By an act of sale on the same date they each transferred a 2 1/2 percent interest in the property to Anthony Trapani, thus retaining a 10 percent interest. This is the percentage which each held in Old Southport when the conveyance to Riverside was executed; the bases of their respective *114 interests in Old Southport at that time is not shown by the record. The Old Southport property had been allowed to deteriorate for several years, and in 1960 Carlos proposed that the co-owners repair it and hold it for rental purposes. However, the other co-owners did not wish to invest any additional money in it. Carlos agreed to buy their interests, but before completing the purchases Riverside was created with the advice and assistance of an attorney, Jacob J. Amato, now deceased. Amato was paid $2,000 by the organizers of Riverside. Three of the certificates of Riverside stock, each representing 4 shares, were issued in the names of Jacob G. Hecker, Theophile F. Suberville, and Harold E. Wahl, and were retained in Amato's offices. In September 1959 Carlos agreed to purchase the 10 percent interest in Old Southport of Guy Chivleatto, Jr., for a total price of $5,000, payable in 25 monthly installments of $200 each. The payments to Chivleatto did not begin until April 6, 1960, and were completed on September 6, 1961. Although Chivleatto was not formally issued any Riverside stock, his agreement with Carlos provided that he was to have a 10 percent interest in Riverside until *115 the payments to him were completed. Anthony Trapani, who also owned a 10 percent interest in Old Southport, received $5,000 therefor when he signed the act of sale of July 22, 1960. Anthony Marcello received no cash upon the transfer of Old Southport to Riverside and received only stock in the latter. He transferred his Riverside stock to Carlos in 1962 or 1963, in connection with an adjustment between them of a $3,000 indebtedness. The community of Carlos and Jacqueline realized a gain of $13,000 on the transfer of Old Southport to Riverside. The community of Anthony and Jeannine likewise realized gain in the amount of $13,000 on the same transaction. Opinion Taking the entire record into account we have found that Carlos and Anthony each held a 10 percent interest in the Old Southport property at the time it was sold to Riverside. This finding is supported by a series of conveyances introduced into evidence and is consistent with the testimony of two of the seven grantors in the act of sale of July 22, 1960, in addition to that of Carlos and Anthony. No evidence was offered to show the consideration paid by Carlos or Anthony for their interests in Old 1014 Southport or *116 the extent to which such cost bases had been consumed by depreciation allowed or allowable on the property. We therefore treat their respective bases in Old Southport as zero. For purposes of measuring the gain, the note given by Riverside, in the absence of evidence to the contrary, is deemed to have value equal to its face amount. The $13,000 gain realized each by Carlos and Anthony is long-term capital gain. Respondent contends that Carlos acquired the interests of all the other owners of Old Southport, which was depreciable property, and then sold the property to Riverside, a corporation of which he owned more than 80 percent in value of the outstanding stock, with the result that his gain from the sale of Old Southport is taxable as ordinary income under section 1239. [3]
*117 We disagree. Carlos may have agreed to purchase the interests of some of the other owners of Old Southport, but none of these purchases had been completed prior to the transfer. Nor do we think that the ownership record reflected by the deeds is spurious. Furthermore, while the record is not as complete as it might be on the ownership of Riverside's stock or even the amount of such stock, we think it is sufficient to show that Carlos did not own 80 percent in value of such stock on July 22, 1960. Guy Chivleatto did not receive the final payment from Carlos for his 10 percent interest in Old Southport until September 6, 1961, and his undisputed testimony is that, under the terms of his agreement with Carlos, he was to own a 10 percent interest in Riverside until he was paid in full. Anthony's ownership of a 10 percent interest continued until 1962 or 1963. Finally, from the facts that Anthony Trapani was paid $5,000 for his interest in Old Southport when he signed the act of sale and that Riverside stock certificates were issued in the names of Jacob G. Hecker, Theophile F. Suberville, and Harold E. Wahl, we infer that other funds, in addition to the Old Southport property, were invested *118 in Riverside when it was organized. For all these reasons we think it clear that the ownership requirements of section 1239(a)(2) are not met. Petitioners argue that the seven co-owners, in substance exchanged their Old Southport property solely for the Riverside stock, that they were in control of the corporation immediately after the exchange, and that, therefore, no gain or loss should be recognized on the transaction under section 351. [4] We reject this argument also. "Control" as used in section 351 is defined in section 368(c), [5] and the record does not show that the seven co-owners owned stock "possessing at least 80 percent of the total combined voting power" of Riverside's stock. Indeed, as noted above, Anthony Trapani, one of the seven grantors in the act of sale, was paid $5,000 for his 10 percent interest in Old Southport and evidently received no stock whatever. In addition, petitioners failed to establish the percentage of voting power represented by the stock issued in the names of Hecker, Suberville, and Wahl. 1015 We do not think the record will support the application of section 351. *119 Issue 2. The "John Cutrone transaction" Findings of Fact In the notices of deficiency for 1960 respondent determined that the community of Carlos and Jacqueline received "Other income" in that year, unreported on their returns, in the amount of $100,000. On brief respondent concedes that the total amount of "Other income", derived from the "John Cutrone transaction," was only $50,000. Prior to July 1, 1960, Carlos learned that stock in Churchill Farms, Inc. (hereinafter Churchill Farms), and Bayou Verret Land Co., Inc. (hereinafter Bayou Verret), and a half interest in 527 acres of land known as the Elsie M. Churchill Tract - all owned by the Cutrone family - were for sale. Carlos did not have available cash to make the purchase. He informed J. Folse Roy (hereinafter Roy) of the availability of these properties, and Roy arranged to borrow about $1,000,000 from Perry Corbett. Roy then opened purchase negotiations with the Cutrone family. On July 9, 1960, John Cutrone, Luke Cutrone, Camille A. Cutrone, C.J. Cutrone, Rita Mae Cutrone, Lawrence Cutrone, and Anthony Freia executed a "STOCK PURCHASE AGREEMENT," whereby they sold to Perry Corbett 106 shares of the preferred stock *120 and 2,173 shares of the common stock of Churchill Farms for $150,000. The stock so sold constituted about 35 percent of the then outstanding capital stock of Churchill Farms. On the same date John Cutrone, Luke Cutrone, Camille A. Cutrone, Lawrence Cutrone, and Anthony Freia executed a "STOCK PURCHASE AGREEMENT," whereby they sold to Perry Corbett 8 shares of the common stock of Bayou Verret for $25,000. There was a total of 20 shares of such stock then outstanding. Also on July 9, 1960, John Cutrone, Luke Cutrone, Camille A. Cutrone, Lawrence Cutrone, and Anthony Freia executed an "AGREEMENT TO SELL AND PURCHASE REALTY," whereby they agreed to sell to Perry Corbett their one-half interest in the Elsie M. Churchill Tract for $25,000. In executing the foregoing instruments Perry Corbett was acting on behalf of Roy. Three checks, payable to "John Cutrone, Agent," or to John Cutrone and others, were issued on July 9, 1960, in the respective amounts of $10,000, $15,000, and $75,000, drawn by M.H. Connolly, attorney at law, on The Hibernia National Bank; on September 6, 1960, three similar checks were issued. These checks covered the $200,000 purchase price specified in the three *121 agreements described above. Following the delivery of these checks, the shares of stock referred to in the above agreements were transferred on the books of Churchill Farms and Bayou Verret one-half to the name of Roy and the other half to the name of Joseph C. Marcello, son and nominee of Carlos. The total payments of $200,000 to the Cutrone family were derived from the loan obtained by Roy from Perry Corbett. Also, at or about the same time, Roy loaned Carlos $100,000. Under date of July 6, 1960, Carlos had executed a promissory note to the order of Roy in the amount of $300,000, payable within five years and bearing interest at the rate of 5 percent after maturity. The note recited that it was secured by the following: Certifi-cate No.
Corporation
Shares
A-62
Churchill Farms
51.94 Preferred
A-65
Churchill Farms
1.06 Preferred
C-46
Churchill Farms
1054.77 Common
C-49
Churchill Farms
31.73 Common
16
Bayou Verret
3.92 Common
19
Bayou Verret
.08 Common The note also was secured subsequently by a promissory note of Vincent C. Rodriguez in the amount of $12,500, dated November 25, 1960, and payable to Florence Montaido. The due date of Carlos' *122 note was extended to July 5, 1969, by a letter dated June 28, 1965, from Roy to Carlos. On August 31, 1960, the vendors named in the above-described "AGREEMENT TO SELL AND PURCHASE REALTY" executed an act of sale whereby they conveyed their one-half interest in the Elsie M. Churchill Tract to Vincent C. Rodriguez. Subsequently, on November 25, 1960, Rodriguez executed a "COUNTER LETTER" declaring that his interest in the Tract was only 2 percent of the one-half interest conveyed to him on August 31, 1960, and that the other 98 percent of the undivided one-half interest was owned by Roy. Also on November 25, 1960, Roy executed a "COUNTER LETTER" declaring that Carlos was the owner of an undivided one-half interest in his interest in the Tract, subject, however, 1016 to the satisfaction by Carlos of his indebtedness of $300,000 to Roy as evidenced by the above-described promissory note of July 6, 1960. The $300,000 note given by Carlos to Roy, secured as described above, was pledged by Roy to secure, in part, the $1,000,000 loan from Perry Corbett. Carlos did not realize any taxable income in connection with his acquisition of an interest in the Cutrone properties. Opinion
*123 Relying on a letter which Roy sent to his accountant on March 22, 1962 - in which the latter was instructed to set up accounts showing $150,000 as Roy's cost of his share of the Cutrone properties - respondent contends that Carlos received, in effect, a $50,000 commission on the Cutrone transaction. Respondent argues that the total fair market value of the Cutrone properties at the time of their sale was $200,000, the cost thereof, and that if Roy's basis is $150,000, then Carlos' basis is only $50,000. Since Carlos acquired $100,000 worth of property for half that amount, the difference, respondent argues, is taxable income. We disagree. The record shows that upon completion of the Cutrone transaction, Carlos owed Roy $300,000 on the July 6, 1960, note. In return for his making the note Carlos received the following: (1) An advance of $100,000 in cash; (2) subject to his satisfaction of the note, a one-half interest in the Cutrone properties, which cost $200,000; and (3) freedom from having to pay interest on the note for a period of five years, from July 1960 to July 1965 (which right, if discounted at the rate of 7 percent per annum, would be valued at close to $100,000). Thus, *124 Carlos paid $100,000 for his interests in the Cutrone properties, not $50,000 as respondent suggests. We do not think that Roy's instruction to his accountant to set up a cost basis of $150,000 for his interest in the Cutrone properties establishes that Carlos received taxable income of $50,000 on the transaction. Issue 3. Dividends from Jacqueline, Inc. Findings of Fact Respondent determined that Carlos and Jacqueline, as members of their marriage community, each realized taxable income for 1960 of $10,837.97, in the form of constructive dividends resulting from the payments by Jacqueline, Inc., of installments due on a note of $100,000 given by Carlos and Rosario Occhipinti to M. J. Carbone and L.A. West. The facts on this issue are set forth in detail in our Findings under Issue 4 in Rosario Occhipinti, T.C. Memo. 1969-191, decided this day, which are incorporated herein by this reference. Opinion For the reasons stated in Rosario Occhipinti, supra, we are of the opinion that the community of Carlos and Jacqueline realized taxable income to the extent of 50 percent of the payments made by Jacqueline, Inc., on the $100,000 note. Consistent with *125 our holding there, we also hold that Carlos and Jacqueline are entitled to interest deductions in the amounts of the interest paid on the note on their behalf. Issues 4 and 5. Unreimbursed Expenses for 1960 and Automobile Depreciation for 1960 and 1962 Findings of Fact For 1960 Carlos and Jacqueline claimed, and respondent disallowed, deductions for "Expenses incurred in and for business-not deducted by them or reimbursed," as follows: Item
Amount
Gas and Oil
$ 911.04
Promotion
14.68
Repairs (Automobile)
81.01
Travel-Hotel
541.75
Entertainment 600.00
Total
$2,148.48
For 1960 and 1962 Carlos and Jacqueline claimed deductions for depreciation of an automobile in the respective amounts of $1,250 and $1,500. On or about December 22, 1959, Carlos purchased a new 1960 Cadillac Fleetwood Special sedan at a stated purchase price of $7,969.22. The purchase price was paid by cash of $4,100 and a trade-in allowance of $3,869.22 for a 1958 Cadillac sedan. Carlos had several business interests during the years in issue, including, among others, part ownership of the Old Southport property, membership in the Town and Country Motel (hereinafter Town & *126 Country), and Jefferson Music Co. partnerships, and stock ownership in Jacqueline, Inc., Motor Hotels of Louisiana, Inc., LeBaron Motor Hotels, Inc., Churchill Farms, 1017 Bayou Verret, and Riverside. Town & Country reimbursed its partners for expenses incurred in its business. The Cadillac Fleetwood was used in commuting between his home and his work and for other personal uses, as well as in the management of his various business interests. Fifty percent of the sums deducted for gas and oil, repairs, and automobile depreciation were attributable to the latter activity. Opinion The record is barren of any evidence indicating the extent to which the business use of the Cadillac was attributable to Carlos' respective business interests, which included investments in corporations, partnerships, and real estate. Of course, a shareholder may not deduct the expenses of his corporation, Deputy v. duPont, 308 U.S. 488 (1940); Jacob M. Kaplan, 21 T.C. 134, 146 (1953); a partner may not deduct business expenses of the partnership on his personal return unless, which *127 is not the case here, there is an agreement among the partners that such expenses shall be borne by him out of his individual funds, Robert J. Wallendal, 31 T.C. 1249, 1252 (1959); and a taxpayer may not deduct reimbursable expenses for which reimbursement was not sought. Coplon v. Commissioner, 277 F. 2d 534 (C.A. 6, 1960), affirming per curiam a Memorandum Opinion of this Court. However, we are satisfied that the automobile expenses and depreciation were not expenses of the various partnerships or corporations in which Carlos invested, but rather were incurred by him "for the management, conservation, or maintenance of" those investments. Sec. 212. In deciding that Carlos and Jacqueline are entitled to deduct 50 percent of the gas and oil and repairs expenses claimed for 1960, and 50 percent of the depreciation claimed for 1960 and 1962, we have relied on the principle of Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). The record does not, in our view, justify a holding that any part of the other amounts claimed - for promotion, travel-hotel, and entertainment - if expended, in fact represented business expenses incurred in carrying *128 on Carlos' business, section 162, or expenses incurred by him for the production of income, section 212. Issue 6. Rental Expenses Findings of Fact For 1960 Carlos and Jacqueline claimed deductions on their individual returns for "Rental Expenses." The total amounts deducted, the amounts conceded by the parties, and the amounts remaining in issue are as follows: Item
Amounts
Amounts
Amount
Amounts
Deducted
Conceded by Conceded by
Remaining
Respondent
Petitioners
in Issue
Repairs
$ 1,649.50
$ 249.50
$ 1,400.00
Utilities
110.91
110.91
Bank charges
6.43
6.43
Taxes
606.32
606.32
Depreciation Frame building
500.00
500.00
Furniture
600.00
$ 600.00
Old Southport * 3,399.63
3,399.63
Total
$ 6,872.79
$ 866.84
$ 600.00
$ 5,405.95
* This item consisted of current depreciation of $2,799.63 and additional depreciation for prior years of $600. At the trial respondent stipulated that "the expenses listed on the rental schedule of Carlos and Jacqueline Marcello on their return for the taxable year 1960 were paid," [6] and that such expenses were paid by them. The "Rental Expenses" were incurred in connection with the Old Southport *129 property. The facts relating to the ownership of Old Southport in 1960 are set forth in our Findings under Issue 1 above. Of the amounts remaining in dispute, the community of Carlos and Jacqueline is entitled to deductions for 1960 of $140 for repairs and $60.63 for taxes. Opinion In making our findings as to the amount of the rental expense deductions to which Carlos and Jacqueline are entitled in respect of the Old Southport property in 1018 1960, we have treated Carlos as a 10 percent owner, consistent with our findings in connection with Issue 1 above. Carlos is not entitled to deductions for expenses paid by, or on behalf of, his co-owners. Regarding the claimed depreciation deductions, we noted above under Issue 1 that Carlos had failed to establish the basis of his interest in Old Southport. Having failed to do so, he and Jacqueline are not entitled to depreciation deductions with respect to that property. Issue 7. Damages to Elsie M. Churchill Tract Findings of Fact During 1961 Republic Natural Gas Company (hereinafter Republic) a lessee of Churchill Farms, a corporation in which *130 Carlos and Roy were substantial stockholders, excavated an access canal through the Elsie M. Churchill Tract to an oil well drill site located on Churchill Farms' property. Title to an undivided one-half interest in the Tract was vested in Elsie M. Churchill. The other undivided one-half interest in the Tract was beneficially owned as follows: Vincent C. Rodriguez owned 2 percent of the one-half interest, Roy owned 49 percent, and Carlos owned the remaining 49 percent. See our Findings under Issue 2 above. On March 10, 1961, Republic, as consideration for the execution of servitude agreements and damage releases in respect of the excavation of the canal, issued the following drafts on the Republic National Bank of Dallas: To Churchill Farms For Servitude Agreement
$ 1,400
Damage Release
12,600
To Vincent C. Rodriguez For Servitude Agreement
550
Damage Release
4,950
To John Cutrone, as Agent and Attorney in fact for Elsie M. Churchill For Servitude Agreement
550
Damage Release
4,950 Of the $4,950 for "Damage Release" received by Rodriguez, he paid $2,425.50 to Carlos and a like sum to Roy, and retained only $99 for himself. Subsequently, in 1961, Churchill *131 Farms issued its check no. 88 for $5,000 to Rodriguez who, in turn, paid $2,450 to Carlos and a like sum to Roy. (The Findings under Issue 7 in Churchill Farms, Inc.,, T.C. Memo. 1969-192, decided this day, are incorporated herein by this reference.) On their joint income tax return for 1961 Carlos and Jacqueline reported the following item: Churchill Farms - (damages) $4,875.50 (Non Taxable) The notice of deficiency issued to Carlos and Jacqueline for 1961 contained the following: It has been determined that the amount of $4,875.50 shown on your return under the heading Churchill Farms (damages) and excluded from your taxable income is not excludible from your taxable income under any provision of the Internal Revenue Code. Opinion Respondent bases his determination that the $4,875.50 was taxable income on the grounds (1) that the $2,450 received by Carlos from Churchill Farms was a constructive dividend, and (2) that the $2,425.50 received from Republic was not shown, in fact, to have been paid for release of a damage claim but "was basically nothing more than in exaction which J. Folse Roy knew he could extract from Republic Natural Gas Company and which *132 Republic was willing to pay, under whatever name, in order to be able to continue its drilling operation free of further interference." We agree that the $2,450 was a constructive dividend to the extent of Churchill Farms' available earnings and profits. [7] See sec. 316. There is no showing of any substantial grounds for a damage claim against Churchill Farms by Carlos as one of the Elsie M. Churchill Tract co-owners. Nor is there any showing that Elsie M. Churchill, the owner of an undivided one-half of the Tract, shared in this payment or any other 1019 damage payment by Churchill Farms. We held in Churchill Farms, Inc., supra, that the $5,000 payment was not deductible by that corporation as a damage claim, but was "only an imaginative attempt to withdraw funds" from Churchill Farms for the benefit of its two principal stockholders, Carlos and Roy. *133 As to the $2,425.50 received from Republic, however, we find no support whatever for respondent's position. Petitioners introduced into evidence a "DAMAGE RELEASE," dated March 9, 1961, reciting, inter alia, that the dredging of a canal had destroyed 14.66 acres of land, had caused residual damage, and had "made the development and drainage of said land more expensive and arduous." Petitioners also introduced two Republic drafts payable to Vincent C. Rodriguez, one for $4,950 and the other for $550, and similar drafts to John Cutrone, as Agent and Attorney in fact for Elsie M. Churchill, the other coowner of the Tract. On the face of the $4,950 drafts the following appears: "In full payment of consideration for the execution of a damage release dated March 9, 1961 in conjunction with the dredging of a canal across certain lands owned by payee." Finally, petitioner produced a letter, dated March 10, 1961, to Camille Cutrone, petitioners' attorney, reciting that the drafts, which accompanied the letter, were given for the servitude agreements and damage releases in connection with the canal. In the absence of any evidence to the contrary, these documents, together with oral testimony *134 as to the negotiations, convince us that the $2,425.50 payment was what it purported to be - a payment for a release of damages. Issue 8. Dividends from Bayou Verret Findings of Fact Sometime before August 1961 J. Folse Roy, vice president of Bayou Verret, arranged for that corporation to borrow $85,000 from Wainer Brothers (hereinafter Wainer), a New Orleans lending institution. At that time it was contemplated that Bayou Verret would use the borrowed funds to acquire adjoining land. However, the negotiations for the purchase of such land failed and were abandoned by October 31, 1961. Nevertheless, on November 15, 1961, Bayou Verret executed a collateral note and mortgage for $150,000, secured by its land, pursuant to a resolution which authorized Roy to borrow money on such terms as he deemed advisable. Thereafter Bayou Verret borrowed $85,000 from Wainer - $42,500 on May 24, 1962, and $42,500 on December 4, 1962. The security for the loans consisted of the $150,000 collateral note and mortgage, and the personal guarantees of Carlos and Roy. Bayou Verret gave Wainer a separate note for each loan, one dated May 24, 1962, and the other dated December 4, 1962, each payable *135 in 35 monthly installments of $387.50 and a final payment of $42,887.50 (the final payment being a sum equal to $387.50 plus $42,500, the principal amount of the loan). The proceeds of the two loans were deposited in Bayou Verret's bank account on May 25, 1962, and December 5, 1962, respectively. On the same dates that Wainer made the loans to Bayou Verret, the latter disbursed by checks the following amounts: Amount of
Payee
Date of Check
Check
May 24, 1962
$ 6,500
Carlos Marcello
May 24, 1962
20,000
Carlos Marcello
May 24, 1962 16,000
J. Folse Roy
Total
$42,500
December 4, 1962
$ 5,000
Carlos Marcello
December 4, 1962
14,250
Carlos Marcello
December 4, 1962
7,000
J. Folse Roy
December 4, 1962 8,750
Joseph Marcello
Total
$35,000 Both Carlos and Roy were substantial shareholders in Bayou Verret at the times these checks were issued and for all relevant periods subsequent thereto. Joseph Marcello is the son of Carlos. Bayou Verret received notes from Carlos and Joseph Marcello as follows: Date on Note
Amount of Note
Obligor
May 24, 1962
$20,000
Carlos Marcello
May 25, 1962
6,500
Carlos Marcello
December 4, 1962
8,750
Joseph Marcello
December 4, 1962
5,000
Carlos Marcello
*136 The signatures on all of these notes had been mutilated. These notes were not given to Bayou Verret at the time of the withdrawals but at a later date. They were all demand notes providing 6 percent interest, but they included no schedule for repayment. During the years 1962, 1963, and 1964, Bayou Verret reported on its tax returns no interest received from any source. Bayou Verret's ledger accounts show total repayments against the disbursements made on May 24, 1962, and December 4, 1962, as follows: 1020 Year
Total Amount Repaid
Payor
1962
$ 320.00
Carlos Marcello
1963
None
Carlos Marcello
1964
None
Carlos Marcello
1965
5,420.00
Carlos Marcello
1966 * 9,230.00
Carlos Marcello
Total
$14,970.00
1962
$ 80.00
J. Folse Roy
1963
None
J. Folse Roy
1964
None
J. Folse Roy
1965
1,380.00
J. Folse Roy
1966 1,057.50
J. Folse Roy
Total
$ 2,517.50
* This repayment was made in two portions, on May 2, 1966, and May 9, 1966. Bayou Verret's books show no repayments by Joseph Marcello. Bayou Verret made monthly payments on the notes to Wainer when due. The first loan from Wainer was renewed by a note in the amount of $47,600 dated May 3, 1966, and the second by a note in the amount of $49,518 dated September 27, 1966. On March 7, 1967, Joseph Marcello purchased the renewal notes from Wainer, using funds from CBM Corporation, a corporation owned by the Marcello family; on the same date Bayou Verret gave Joseph Marcello a new note in the principal amount of $93,972.61 in exchange for these renewal notes. In the deficiency notice for 1962, dated March 28, 1966, respondent determined that petitioners realized income from Bayou Verret in the amount of $45,750. The amounts disbursed by Bayou Verret to Carlos on May 24 and December 4, 1962, constituted dividends to the extent of earnings and profits. Opinion Whether Carlos' withdrawals of funds from Bayou Verret in May and December 1962 were loans, as contended by petitioners, or constructive dividends, as argued by respondent, depends upon the intentions of the parties to the transactions. Chism's Estate v. Commissioner, 322 F. 2d 956, 960 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court. To prove that the intentions of Carlos and Bayou Verret were to create loans, petitioners rely upon the surrounding "business" circumstances, contending that Bayou Verret borrowed $85,000 to purchase additional land and, when the land could not be acquired, loaned the loan proceeds to stockholders, including Carlos, to minimize its interest expense. Yet as pointed out in our opinion in Bayou Verret Land Co. [Dec. 29,744], 52 T.C. No. 105, decided this day, all land acquisition negotiations had terminated prior to Bayou Verret's receiving the loan proceeds; notes were not received for all the disbursements; only minimal repayments were made; no interest receipts were reported by Bayou Verret; and most significantly, when the loans became due Bayou Verret did not make demand on its shareholders so that it could pay off its own obligations, but extended them - action wholly inconsistent with a goal of interest expense minimization. Accordingly, this "business" background of the withdrawals does not show that Carlos and Bayou Verret intended the transactions to be loans. In making our ultimate finding of fact we have also considered the traditional criteria for determining whether shareholder withdrawals constitute loans or dividends. See, e.g., Chism's Estate v. Commissioner, supra; Regensburg v. Commissioner, 144 F. 2d 41 (C.A. 2, 1944), certiorari denied 323 U.S. 783 (1944), affirming a Memorandum Opinion of this Court; Gurtman v. United States, 237 F. Supp. 533 (D.N.J. 1965), affirmed per curiam 353 F. 2d 212 (C.A. 3, 1965); Ben R. Meyer, 45 B.T.A. 228 (1941); see generally, 1 Mertens, Law of Federal Income Taxation, sec. 9.21. While some of the objective facts - giving of notes to cover part of the advances, recording the withdrawals in Bayou Verret's books as receivables, and making partial repayments - appear at first blush to support petitioner's position, closer analysis shows them to be little more than window dressing, and reveals an informality inconsistent with an intention to create an enforceable debt. See W. T. Wilson, 10 T.C. 251, 259 (1948). Carlos gave notes only for $31,500 of the $45,750 which he withdrew, and Roy gave no notes at all. Moreover, the notes which Carlos gave were demand notes which provided no schedule for repayment. Cf. Gurtman v. United States, supra at 536. No demand for repayment appears to have been made, cf. Ben R. Meyer, supra at 240, and no interest has been paid to Bayou Verret by Carlos. Cf. Chism's Estate v. Commissioner, supra at 958. The fact that Carlos' 1021 withdrawals were treated on Bayou Verret's books as a "loan" is not controlling. See Ben R. Meyer, supra at 239. Turning to the alleged partial repayments, almost two-thirds of such amounts were repaid after the deficiency notice was sent, and over nine-tenths of the remainder was repaid within the immediately preceding year, by which time, it may be assumed, Carlos was aware of the audit of the disputed transaction. A taxpayer's "repayment" of a purported loan after he learns of the Commissioner's dividend contention is entitled to little weight in determining the intention of the parties at the time of the withdrawal. See Gurtman v. United States, supra at 536; cf. Regensburg v. Commissioner, supra at 44; see generally, Note, Stockholder Withdrawals - Loans or Dividends?, 10 Tax L. Rev. 569, 573 (1955). Having considered the relevant factors in the light of the entire record, we have concluded that Carlos' withdrawals from Bayou Verret in 1962 were constructive dividends to the extent of that corporation's available earnings and profits. [8] *137 Issue 9. Dividends from Churchill Farms Findings of Fact In the notice of deficiency for 1962 respondent determined that Carlos and Jacqueline "realized income from Churchill Farms, Inc., * * * in the amount of $22,413,34 rather than $10,742.00 as shown on your return." Respondent concedes on brief that the unreported income, purportedly received by Carlos and Jacqueline in the form of constructive dividends, did not exceed $4,853. Our findings under Issue 1 in Churchill Farms, Inc., supra, relating to the purposes for which the headquarters building and related facilities were constructed, are incorporated herein by this reference. Opinion At the trial, counsel for respondent stated that the amount determined to be unreported income represented Carlos' share - calculated by reference *138 to his and his son's percentage ownership of Churchill Farm stock - of the amounts deducted for 1962 by Churchill Farms as repairs and maintenance expenses (and insurance) attributable to the headquarters building and surrounding facilities on its property. On brief, however, respondent raised, for the first time, the argument that the unreported income consisted of the fair rental value of the headquarters facilities, which respondent computed to be $4,853 for 1962. Respondent's positions, both at trial and on brief, are based on his contention that the headquarters building and related facilities were not constructed for business reasons, but rather for the recreational use of Carlos and his friends. This contention was also raised under Issue I in Churchill Farms, Inc., supra; for the reasons stated therein, we reject respondent's contention here. [9]
Issue *139 10. Income from Town & Country Findings of Fact and Opinion Respondent determined that Carlos and Jacqueline understated Carlos' distributive share of the income of Town & Country for 1960, 1961, and 1962. Our Findings and Opinion in Salvador J. Marcello, T.C. Memo. 1969-189, decided this day, are incorporated herein by this reference. The numerous adjustments therein to Town & Country's income will be taken into account in making the Rule 50 computation in the present proceedings. In Salvador J. Marcello, supra, we reserved for later consideration the question whether Carlos is entitled, in his individual capacity, to deductions for a portion of the interest paid by Town & Country, in the amounts of $12,720.84 and $7,705.83, during its fiscal years ending January 31, 1961 and 1962, respectively, on a $210,000 note given to the Krauss Company Employees Pension Fund (hereinafter Pension Fund). We have concluded that Carlos and Jacqueline are entitled to deduct 25 percent of the interest payments made by Town & Country to the Pension Fund. [10] See our 1022 discussion under Issue 8 in Frank Occhipinti, T.C. Memo. 1969-190, decided *140 this day. Although Carlos benefited from Town & Country's interest payments to the extent of 50 percent thereof, he was only a 25 percent partner, and the record does not show that any adjustment of his partnership account in relation to that of the partner who received no benefit therefrom - Salvador or the successor partner, Joseph C. Marcello - was either contemplated or made. Yet section 163(a)[11] allows a deduction only for interest paid or accrued by the taxpayer, not for interest paid by another on the taxpayer's behalf. Carlos filed his return on a cash basis, and there is no showing that he paid, actually or constructively, more than 25 percent of the interest due the Pension Fund. *141 Issue 11. Additions to Tax under Section 6653(a) Respondent determined additions to tax under section 6653(a). [12] That section imposes an addition to tax if any part of any underpayment is "due to negligence or intentional disregard of rules and regulations (but without intent to defraud)." Carlos and Jacqueline bear the burden of showing that no negligence or intentional disregard of rules and regulations occurred. Marcello v. Commissioner, 380 F. 2d 499, 505-507 (C.A. 5, 1967), modifying a Memorandum Opinion of this Court. Carlos was an active member of the Town & *142 Country partnership during the years in issue. That partnership was negligent in maintaining its records and filing its returns, and its negligence is imputed to Carlos and Jacqueline. Salvador J. Marcello, supra. The failure of Carlos and Jacqueline to segregate their records from those of Town & Country led to the omission of the constructive dividends from Jacqueline, Inc., attributable to its payment of the $100,000 note. See Issue 3 above. No adequate records were maintained regarding automobile, promotion, repairs, travel, and entertainment expenses claimed as deductions for 1960 or automobile depreciation claimed as deductions for 1960 and 1962. See Issues 4 and 5 above. Carlos and Jacqueline failed to segregate their portion of the deductible rental expenses for Old Southport from those of the other co-owners. See Issue 6 above. The withdrawal of funds from Churchill Farms under the guise of a "damage payment" and the withdrawal of funds from Bayou Verret under the guise of "loans," combined with the failure to report the withdrawals as income, are evidence of a lack of reasonable care. See Issues 7 and 8 above. Finally, we note that eight additional adjustments to their *143 income have been conceded by Carlos and Jacqueline. In the light of these facts, and in the absence of positive evidence explaining the errors in their returns, we hold that Carlos and Jacqueline have failed to carry their burden of proving that the underpayments were not due to negligence within the meaning of section 6653(a). The additions to tax are sustained. Issue 12. Sale of Old Southport Club - Anthony and Jeannine The taxability of the income derived by Anthony and Jeannine in connection with the sale of Old Southport in 1960 is discussed above in connection with Issue 1. Issue 13. Unreimbursed Business Expenses - Anthony and Jeannine Findings of Fact On their joint return for 1960 Anthony and Jeannine claimed deductions, all of which respondent disallowed, for unreimbursed business expenses in the following amounts: Car Insurance (50%)
$ 83.38
Repairs & Maintenance
110.50
Gas & Oil - Grease
207.00
Depreciation
493.75 1023 All the above expenses relate to the operation of an automobile owned by Anthony and used by him in connection with his work for Southern Tours, a partnership of which he was a member, and for Town & Country. Southern *144 Tours was engaged in conducting sightseeing tours - providing bus transportation, lecturers, and guides - in New Orleans and environs. During 1960 neither Southern Tours nor Town & Country had company cars. Therefore, Anthony's automobile was used for transporting customers of the sightseeing service to bus pickup points and for doing day-to-day banking and other errands. Town & Country, but not Southern Tours, had a policy of reimbursing its partners and employees for business expenses incurred in connection with its business. Opinion The issue as to the deductibility of the automobile expenses is purely factual. Anthony did not introduce any substantiating records, and we infer that he used the automobile, in part, for such nonbusiness purposes as commuting. Nor does the record show the portion of the claimed expenses incurred in the business of Town & Country - a partnership of which Anthony was neither a member nor an employee. Section 162 allows deductions only for expenses incurred in carrying on the taxpayer's business. Finally, as to the portion of the expenses incurred on behalf *145 of Southern Tours, they were expenses of that partnership, not of Anthony individually. As we noted in the Opinion under Issues 4 and 5 above, a partner may not deduct business expenses of the partnership on his personal return unless there is an agreement among the partners that such expenses shall be borne by him individually, Robert J. Wallendal, supra at 1252; yet Anthony produced no evidence of the existence of such an agreement. For these reasons, we conclude that the disputed deductions must be disallowed. Issue 14. Additions to Tax under Section 6653(a) - Anthony and Jeannine The deficiency asserted against Anthony and Jeannine was based on determinations of the following additional income and unallowable deductions: Partnership income
$ 38,746.83
Loss from rents
375.00
Automobile expense
894.63
Sale of property 130,000.00
Total
$170,016.46 The "Partnership income" determination relates to Southern Tours, and respondent, by stipulation, conceded this issue. The item referred to as "Loss from rents," involving depreciation on Old Southport, also was conceded by respondent. The "Sale of property" increase in taxable income involves *146 the sale of Old Southport. Issue 12 above. On brief respondent conceded that 87 1/2 percent of the sale price of that property, or $113,750, may not be attributed to Anthony and Jeannine, and has further conceded that the remaining $16,250 should be taxed as long-term capital gain rather than ordinary income. We have held that these petitioners realized long-term capital gain of only $13,000 on the transaction, resulting in an increase to taxable income of only $6,500. We have also held that the other adjustment - the "Automobile expense" in the amount of $894.63 - must be sustained. Thus, we have sustained respondent on less than 5 percent of the total adjustments to income made in the deficiency notice. While Anthony frankly admitted that he did not remember how much he paid for his interest in Old Southport, he testified that he had deducted depreciation on Old Southport in prior years, see Anthony Marcello, T.C. Memo. 1964-301, and that the deduction claimed in 1960 was the remainder of his basis. He also admitted that he did not have records to substantiate his automobile expenses. While in other contexts the failure to maintain records on these items might support *147 a section 6653(a) addition to tax, we do not think such minor discrepancies - so small in relation to the determined deficiency - justify imposition of the penalty in this case. Cf. Charles M. Kilborn, 29 T.C. 102 (1957), modified on other issues by stipulation in an unreported opinion ( C.A. 5, 1958, 2 A.F.T.R. 2d 5812,; Claire L. Canfield, 7 T.C. 944 (1946), reversed on other issues 168 F. 2d 907 (C.A. 6, 1948). Decisions will be entered under Rule 50. 1024 Footnotes
1. These cases were tried in consolidation with Salvador J. and Florence Marcello, docket Nos. 3535-64 and 3981-65; Joseph C. and Barbara Marcello, docket Nos. 3743-65 and 2907-66; Frank and Lady Patricia Occhipinti, docket No. 5691-65; Rosario and Julia Occhipinti, docket No. 5760-65; Churchill Farms, Inc., docket No. 6307-66; and Bayou Verret Land Co., Inc., docket No. 6308-66. The present cases are severed for a separate opinion.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
3. SEC. 1239. GAIN FROM SALE OF CERTAIN PROPERTY BETWEEN SPOUSES OR BETWEEN AN INDIVIDUAL AND A CONTROLLED CORPORATION. (a) Treatment of Gain as Ordinary Income. - In the case of a sale or exchange, directly or indirectly, of property described in subsection (b) - * * * (2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren; any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231. (b) Section Applicable Only to Sales or Exchanges of Depreciable Property. - This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167. * * *↩
4. SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR. (a) General Rule. - No gain or loss shall be recognized if property is transferred to a corporation * * * by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property. * * * ↩
5. SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS. * * * (c) Control. - For purposes of part I (other than section 304), part II, and this part, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.↩
6. Respondent declined to stipulate as to the deduction for depreciation.↩
7. Churchill Farms' corporation income tax return for 1961, reflecting its earned surplus, is in evidence. Our opinion in Churchill Farms, Inc., T.C. Memo. 1969-192↩, decided this day, requires numerous adjustments to that petitioner's taxable income, and hence to its earnings. The record does not indicate that any other adjustments to Churchill Farms' earnings need be made to compute its earnings and profits. Carlos' basis in his Churchill Farms' stock has been decided above under Issue 2 - i.e., one-half of the $150,000 paid for that stock. Determination of the character of the distribution from Churchill Farms will be made under section 301(c).
8. The computation of Bayou Verret's earnings and profits will be made in a manner similar to that suggested in footnote 7, supra. The determination of the character of the May 24 and December 4, 1962, distributions to Carlos will be made under section 301(c), using as Carlos' basis one-half of the $25,000 paid to the Cutrones for the Bayou Verret stock. See Issue 2 above.↩
9. No issue was raised herein as to the treatment of the portion of the supervisor's fee paid by Churchill Farms to Carlos which exceeded the amount we allowed as a deduction under Issue 8 in Churchill Farms, Inc., supra.↩ The full amount of that fee was reported by Carlos as ordinary income.
10. Town & Country kept its records and filed its partnership returns on a fiscal year basis, ending January 31, while Carlos and Jacqueline reported on a calendar year basis. The note to the Pension Fund being payable in equal monthly installments, Carlos' and Jacqueline's combined interest deduction for 1960 is 1/4 X 11/12 $12,720.84; their interest deduction for 1961 is 1/4 X 1/12 X $12,720.84 plus 1/4 X 11/12 X $7,705.83; and for 1962 their interest deduction is 1/4 X 1/12 X $7,705.83. ↩
11. SEC. 163. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness. * * *↩
12. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. * * *↩