## REGENSBURG v. COMMISSIONER OF INTERNAL REVENUE, and four other cases.

### Nos. 168–172.

Circuit Court of Appeals, Second Circuit.

July 19, 1944.

Writ of Certiorari Denied Dec. 4, 1944.

See 65 S.Ct. 272.

Arthur B. Hyman, of New York City (John W. Davis, Arthur B. Hyman, and Davis M. Zimmerman, all of New York City, of counsel), for petitioners.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Robert N. Anderson and Harry Baum, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

These proceedings involve the income tax liability for the years 1936 to 1940, inclusive, of four brothers, Mortimer, Isaac, Melville and Jerome Regensburg, who were the principal shareholders of E. Regensburg & Sons, a New York corporation, during the tax years in suit. Jerome Regensburg died on October 31, 1941 and his estate is represented by his executrix. Sophy P. Regensburg is the wife of Melville, with whom she filed a joint return for the year 1940, and she joins in his petition with respect to that year.

E. Regensburg & Sons was organized in 1903 to manufacture and deal in tobacco products. It took over the business of a family partnership which had already prospered in that field; its business career has been remarkably successful. The corporation had a capital stock of 1,000 shares of par value of $100 each. This capitalization has remained unchanged, and the shares have never been held outside the Regensburg family. The holdings of the brothers who are petitioners here are shown in the following tabulation:

|          | 1903 | 1931 | 1939  | 1940  |
|----------|------|------|-------|-------|
| Mortimer | 230  | 264  | 281½  | 281½  |
| Isaac    | 230  | 264  | 264   | 268⅜  |
| Jerome   | 140  | 174  | 174   | 178⅜  |
| Melville | 50   | 114  | 114   | 118⅜  |

Ever since the business was incorporated the brothers have maintained individual open accounts in which withdrawals were debited and salaries, dividends, interest and other items were credited. Withdrawals were made at will, and have not been proportionate to their stockholdings. Smaller shareholders who were not officers or directors made no withdrawals, receiving only such funds as were paid in the form of declared dividends. Between 1903 and 1935 dividends totalling $2,270,000 were authorized. None has been declared during the tax years in suit, and the corporation shows an operating loss for each of said years, although the surplus on January 1, 1936 was some $4,850,000 and remained more than $4,000,000 on December 31, 1940.

During all the tax years in question, with one exception,* the petitioners made withdrawals in excess of the credits to their

---

* In 1939 the account of each of the brothers was credited with $14,912.66, his distributive share of their mother's credit balance on the corporation's books at the time of her death. This item plus other usual credits produced credit balances in the accounts of Mortimer, Jerome and Melville.

open accounts and did not report them as income. The commissioner treated such net withdrawals as dividend distributions within the meaning of section 115(a) and (b) of the Revenue Acts of 1936 and 1938, Int.Rev.Code, § 115, 26 U.S.C.A. Int.Rev. Code, § 115. The tax court sustained his ruling. This resulted in the deficiency assessments of which the petitioners complain. The principal question is whether the tax court's finding that the withdrawals were dividend distributions rather than loans is supportable. The facts are not in dispute; only the inferences to be drawn from them.

Except in a few early years and in 1939 as already noted, withdrawals by each taxpayer have exceeded credits to him so that the debit balance of each has mounted steadily. The total of their debits and credits from 1903 to the end of 1940 and their net debit balances on the latter date were as follows:

|  | Cash withdrawn or paid on his behalf by corporation 1903-1940 | Salary | Credits Dividends | Miscellaneous | Total net debit balance Dec. 31, 1940 |
|---|---|---|---|---|---|
| Mortimer | $2,560.845 | $1,140,900 | $555,000 | $115,556 | $ 749,388 |
| Isaac | 3,511.566 | 1,140,900 | 555,000 | 137,994 | 1,677,671 |
| Jerome | 1,535,028 | 861,595 | 394,800 | 73,578 | 250.053 |
| Melville | 1,401,400 | 752,645 | 211,650 | 38,185 | 398,919 |

No interest was accrued or paid and no note or other evidence of indebtedness was ever given for the debit balances. They were carried on the corporation's books as "accounts receivable", however, and were reflected in its statements of surplus, constituting a substantial part thereof. The taxpayers owned practically no property except their stock in the corporation, and no other income producing property. In 1912 Isaac was credited with a cash repayment of $10,000 and in 1924 with a cash repayment of $15,000 neither of which sufficed, however, to give him a net credit balance for those years.

Melville protested to his brothers from time to time as to the withdrawals and promises were given to discontinue or reduce them. In 1934 all the shareholders of the corporation entered into a written agreement that if any of them should sell any of his shares while indebted to the corporation the purchase price should first be applied to discharge such indebtedness without interest; or, if the corporation were the purchaser, the amount of the indebtedness should be deducted from the purchase price. In either event the shareholder was to remain liable for any unpaid balance of his debt to the corporation. As collateral security the corporation was given a lien on the shares, and a reference to the agreement was endorsed on the stock certificates. The certificates so endorsed were delivered to the corporation and are still held by it. None of the taxpayers ever sold any shares. The stock they bought in 1939 and 1940 was similarly deposited by them under the 1934 agreement. Minutes of a meeting of the board of directors held in May 1938 show that Mortimer stated that heavy losses in recent years and the large loans made to its officers had placed the corporation in an unsatisfactory condition and that such loans must cease. All salaries were then reduced 25% and a resolution was adopted "that effective at once no withdrawals of cash for the purpose of loans to officers be permitted." Nevertheless withdrawals continued to be made.

In 1942 the corporation filed a claim against the estate of Jerome, who died in 1941, for $251,277, representing "loans and advances" secured by collateral lien on his shares in the corporation. No objection was made to the claim by his executrix and it has been recognized as a duly proven and binding claim.

During the years 1936 to 1940, inclusive, the net withdrawals of the taxpayers totaled $171,157.50 for Mortimer, $270,-475.65 for Isaac, $92,499.52 for Jerome and $80,252.85 for Melville. The tax court found that each of the amounts making up these totals was a distribution of earnings after February 28, 1913.

Subdivision (a) of section 115 of the applicable Revenue Acts defines "dividends" as "any distribution made by a corporation to its shareholders * * * (1) out of its earnings or profits accumulated

after February 8, 1913, or (2) out of the earnings or profits of the taxable year * * *"; and subdivision (b) provides that every distribution is to be deemed made out of earnings to the extent thereof. The petitioners urge that the evidentiary facts established by the record bound the tax court to infer that their withdrawals were received as loans rather than distributions of corporate earnings. They make a very plausible case. All the documentary evidence, including the corporation's books, is consistent with the theory of loans. Had the tax judge drawn the desired inference we could not say it was unsupported by substantial evidence. But he inferred the opposite and, if it was a permissible inference, we must accept it. It is not an appellate court's function "to weigh the evidence, to draw inferences from the facts, and to choose between conflicting inferences." Wilmington Trust Co. v. Helvering, 316 U.S. 164, 168, 62 S.Ct. 984, 986, 86 L.Ed. 1352. For reasons about to be stated we think the inference was a permissible one.

That the withdrawals were recorded on the corporate books as debits against the taxpayers; that they were not proportionate to holdings of stock nor participated in by all the shareholders; and that the formalities of a dividend declaration were lacking is not conclusive against a finding that the withdrawals were dividends. Chattanooga Sav. Bank v. Brewer, 6 Cir., 17 F.2d 79, certiorari denied 274 U.S. 751, 47 S.Ct. 764, 71 L.Ed. 1332; Hadley v. Commissioner, 59 App.D.C. 139, 36 F.2d 543; Christopher v. Burnet, 60 App.D.C. 365, 55 F.2d 527; Anketell Lumber & Coal Co. v. United States, 1 F.Supp. 724, 76 Ct. Cl. 210; cf. Wiese v. Commissioner, 8 Cir., 93 F.2d 921, certiorari denied 304 U.S. 562, 58 S.Ct. 944, 82 L.Ed. 1529. If the sums withdrawn were actually intended to be loans, it seems extraordinary that they should have been allowed to roll up for nearly forty years until they reached the staggering total of more than $3,000,000 owing by persons who had nothing but their shares of stock with which to pay. The book value of the stock computed without including the petitioners' "loans" as assets was about $1300 per share at the end of 1940. Hence the debt of each taxpayer was greater than the value of his shares. In the case of Isaac Regensburg his debit balance of $1,677,671 was greater than the book value of his stock even when computed with the petitioners' debit balances included at full value. If, however, the withdrawals were actually intended as a method of dividing up the profits or the business according to the respective needs of the petitioners, the only extraordinary feature of the practice would be the inequality in amounts severally withdrawn by them. The total of all withdrawals has never absorbed so much of the available surplus as to jeopardize the financial position of the corporation. Some measure of assurance that the amounts might ultimately be evened up was furnished by the 1934 agreement, which provided that if shares were sold the seller's indebtedness to the corporation should be taken out of the purchase price. Thus the other shareholders assured themselves of an even distribution of earnings in so far as the value of the shares could effect it. The petitioners urge that this agreement alone should dispel any doubts that the withdrawals were recognized as debts. But Judge Sternhagen held that its mere existence did not conclusively characterize the withdrawals as debts, and we agree. Nor do we disagree with his view that the filing of a claim against Jerome's estate and its allowance without objection is not conclusive, considering the date of the occurrence (after dispute had arisen as to the petitioners' taxes) and the intimate family relationship involved. Judge Sternhagen concluded "from all the evidence that a consistent practice in a family corporation of withdrawing the corporation's earnings on an open account, with only negligible repayments in almost the entire forty years of the corporation's existence, indicates an established method of dividend distribution." We think the evidence to support his finding that the withdrawals were not loans is such that we cannot upset it.

It is urged that the tax court committed prejudicial error in the admission and exclusion of evidence. Counsel for the commission was permitted on cross-examination to bring out that part of the money withdrawn by Mortimer and Isaac was used in race-track gambling. We cannot see that the use which the taxpayers made of the money was relevant to the issue whether it was withdrawn as a loan or a distribution of earnings; whichever it was the taxpayer was privileged to use it as he pleased. Nor do his gambling losses throw light on his intention to repay. Some men will gamble in the hope of getting funds

with which to pay their debts, while others will not risk a bet if any debts hang over them. Although we regard admission of the evidence as erroneous, we do not think that it could have prejudiced the outcome before an able and experienced judge. The casual reference to gambling losses in the opinion does not show that any adverse inference was drawn therefrom. In the exclusion of the estate tax returns of two deceased shareholders there was no error. The fact that the commissioner fixed the value of the stock in those estates upon the basis of balance sheets which scheduled the petitioners' withdrawals as loans would not estop him in the present proceedings to deny that they were loans. Moreover the record already established that the withdrawals were charged as loans on the corporate books, so that the excluded evidence was merely cumulative.

Orders affirmed.