MANUEL M. KOUFMAN and CHARLOTTE KOUFMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Koufman v. Commissioner
Docket Nos. 8641-72, 8770-73.
United States Tax Court
T.C. Memo 1976-330; 1976 Tax Ct. Memo LEXIS 73; 35 T.C.M. (CCH) 1509; T.C.M. (RIA) 760330; October 28, 1976, Filed *73 (1) Held, the Commissioner has the burden of proof with respect to 1963, and he has failed to prove--(a) that P was the owner of certain rental income which he received during such year for Northeast, a corporation owned by him; (b) that P realized a taxable gain when he transferred to Northeast the legal title to certain property; (c) that when Northeast transferred certain funds to P and to other corporations owned or controlled by him, it made distributions which were taxable under sec. 341, I.R.C. 1954, relating to collapsible corporations; or (d) that P admitted receiving during such year certain dividends from a corporation owned by him. (2) During the years 1965 through 1969, numerous transfers of funds were made between P and his controlled corporations and between such corporations. Held, the withdrawals made by P are not bona fide loans but are corporate distributions; held, further, the intercorporate transfers are bona fide loans. (3) Held, it has not been established that P's spouse is an innocent spouse within the meaning of sec. 6013(e), I.R.C. 1954. Jonathan J. Margolis,David R. Andelman, and Arnold R. Cutler, for the petitioners. Barry J. Laterman, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies *77 in, and addition to, the petitioners' Federal income taxes: Sec. 6651(a) [1]
Year
Deficiency
Addition
1963
$439,812.26
1965
104,307.49
1966
201,949.08
1967
37,709.56
$8,387.01
1968
6,331.15
1969
5,188.77 Some of the issues are no longer in dispute; those remaining for decision are: (1) Whether certain withdrawals made by the petitioner, Manuel M. Koufman, in the years 1965 through 1969, from corporations owned or controlled by him were loans or dividends to him; (2) whether certain intercorporate transfers during such years between corporations owned or controlled by such petitioner constitute dividends to him; (3) whether the petitioner, Charlotte Koufman, during such years, was an innocent spouse within the meaning of section 6013(e); and (4) whether the year 1963 is barred by the 3-year statute of limitations, or whether the 6-year statute of limitations is applicable for such year. The decision of the last issue turns on--(a) whether Northeast, a corporation owned by Mr. Koufman, was the beneficial owner in 1963 of certain rental income paid to him; (b) whether in *78 such year, the petitioners received a distribution from such corporation taxable under section 341, relating to collapsible corporations; (c) whether in such year, Mr. Koufman realized a gain when he transferred to such corporation the legal title to certain property; and (d) whether he has admitted receiving in such year certain unreported dividends from another corporation owned by him. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Manuel M. Koufman and Charlotte Koufman, husband and wife, maintained their legal residence in Brookline, Mass., when the petitions herein were filed. They filed a joint Federal income tax return with the District Director of Internal Revenue, Boston, Mass., for 1963 and for each year during the period 1965 through 1969. Their 1963 return was filed on or before April 15, 1964. At the time of the trial of this case, the petitioners were separated pursuant to a separation agreement. Mr. Koufman will sometimes be referred to as the petitioner. The petitioner is a real estate developer, builder, and consultant and has been engaged in such activities for approximately 30 years. He started *79 his career by working in a family contracting business when he was about 14 years old. Later, he studied at Lehigh University, Harvard University, and Massachusetts Institute of Technology. Shortly after the end of World War II, the petitioner began a business in which he specialized in the construction and leasing of real estate. Under his usual method of operation, an agreement to lease was initially entered into between him, or a corporation controlled by him, and a prospective lessee who wished to have a building constructed for its use. The petitioner, or his corporation, then located a suitable site for the building and acquired an option to purchase it; whereupon, he entered into negotiations with the prospective lessee concerning the terms of an agreement for the construction of the building and the rental of the property. If they reached agreement, the petitioner proceeded to secure financing for the project by obtaining a mortgage loan on the land and the building to be constructed thereon. Such mortgage loans were always sought from large, publicly held corporations with whom he was unrelated, except as a customer. If a satisfactory mortgage loan was obtained, the *80 option on the land was exercised, and construction was undertaken. The lessees of these projects were large corporations, such as the Great Atlantic and Pacific Tea Company, F.W. Woolworth, General Motors, Chrysler Motors, New England Telephone and Telegraph Company, and International Business Machines Corp. The amount of the mortgage loan obtained by the petitioner was determined by two major considerations: One was the cost of the land and the estimated cost of the building. The other was the projected revenue to be received under the lease of the property. The rental income had to be sufficient to pay off the mortgage loan and supply a sufficient cash flow to meet all of the other obligations under the lease. In computing the estimated cost of the building, the lenders considered that architectural and engineering costs would equal 7 percent of the total cost of construction and that the office overhead and the profit of contractors and subcontractors would amount to close to 30 percent of such total. However, the petitioner's construction costs were usually below the amount estimated by the lenders because he supplied his own architectural and engineering services and *81 did his own building, thus eliminating the profit of the contractors and subcontractors and reducing his other costs. Consequently, the mortgage loans secured by him usually exceeded his construction and land acquisition costs. Any such excess proceeds were held by the corporation constructing and leasing the building for contingencies, but they were sometimes also used as the source for advances to the petitioner or to other corporations owned or controlled by him. The petitioner formed a separate corporation for each project so that he owned or controlled several corporations. He followed such practice because of the advice of his accountants to do so in order to limit his liability. Ordinarily, a corporation, formed for the purpose, acquired the option, held title to the land, and executed the lease, but if the corporation had not been formed by the time the option was acquired, it was taken in the name of a straw person, or of the petitioner, acting for the corporation to be formed. On or about May 24, 1962, the petitioner and Kleven Shoe Sales Co., Inc. (Kleven), a subsidiary of Genesco, Inc., entered into a lease under which the petitioner agreed to construct an office *82 and factory on a certain parcel of land located in North Brookfield, Mass. (North Brookfield property). The lease provided that the petitioner would have the building constructed and ready for occupancy no later than November 30, 1962. The term of the lease was 25 years from the date the lessee took possession of the premises, and the rental payment was to be $126,000 annually, payable in monthly installments of $10,500. The lease further provided that until the building was completed the petitioner could not assign the lease to a corporation or any other person. Kleven's obligations under the lease were guaranteed by Genesco, Inc. Sometime prior to July 18, 1962, the petitioner acquired an option to purchase the North Brookfield property in his name, although he was acting on behalf of a corporation to be formed. While the lease with Kleven was being negotiated, he planned to create a corporation to acquire such property, and he requested his brother, who acted as his attorney, to set up such corporation which would hold title to the North Brookfield property. However, his brother was suffering from Hodgkin's disease, and although he undertook to form the corporation, he *83 never completed it before his death in October 1963. On or about July 18, 1962, the petitioner exercised his option on the North Brookfield property and acquired the property for $18,963.20. He obtained the funds for such property and for the construction of the building thereon by virtue of a loan from the National Shawmut Bank of Boston (Shawmut) on July 10, 1962, in the amount of $1,350,000.00. He deposited all of the loan proceeds in his bank account at Shawmut and identified them as "No. Brookfield Construction Loan." The loan was secured by a mortgage on the North Brookfield property and by an assignment of the Kleven lease. However, Shawmut agreed to allow him to receive and enjoy the rents and profits under the lease as long as he did not default in his repayment of the loan or in his other covenants to Shawmut. On October 10, 1962, Shawmut assigned the petitioner's loan on the North Brookfield property to Prudential Insurance Company (Prudential). Prior to such assignment, the petitioner advised Prudential that the lease on the property would be between Kleven and a corporation formed by him. On or about February 14, 1963, Prudential released the petitioner from *84 any personal liability on such loan. East Coast Development Corporation (East Coast), a corporation in which the petitioner was a 50-percent shareholder, constructed the building on the North Brookfield property. It was completed in November 1962, and Kleven took possession during the latter part of that month. On or about December 28, 1962, Northeast Properites, Inc. (Northeast), was organized. The legal work was performed by the attorneys who took over the task after the illness of the petitioner's brother. The petitioner owned all of Northeast's 10 shares of stock.Northeast was organized to hold title to the North Brookfield property, and it has never acquired any other real estate.
On or about January 16, 1963, Northeast opened an account at the U.S. Trust Co., Boston, Mass. All of Kleven's rental checks, including those for November and December 1962, were deposited in the Northeast account, even though, prior to December 1963, the rental checks were made payable to the petitioner. Kleven's rental payments for November and December 1962 were deposited in Northeast's account on February 15, 1963. The first payment on the North Brookfield mortgage in the amount of $11,630.40 *85 was made from the Northeast account on February 5, 1963, and the subsequent monthly mortgage payments of $8,290.20 were also made from this account. The rental receipts and expenses attributable to the North Brookfield property for the last two months of 1962 and the calendar year 1963 were reflected in Northeast's income tax returns for its taxable years ending June 30, 1963, and June 30, 1964, even though some of the bills were issued in the name of the petitioner. In its return for the taxable year ending June 30, 1963, filed on September 15, 1964, Northeast reported that it acquired the building on the North Brookfield property in 1962 and claimed depreciation on such building for the period beginning with December 1962. On or about November 26, 1963, Northeast borrowed $260,000 from the Industrial Finance Corporation (Finance), a corporation completely unrelated to the petitioner. The loan was secured by a second mortgage on the North Brookfield property and by a secondary assignment of the Kleven lease. In addition, the petitioner endorsed the note made by Northeast. Throughout the negotiations leading up to the loan, all of the parties assumed that Northeast held title *86 to the North Brookfield property. However, in connection with the recording of the mortgage, it was discovered that legal title had never been transferred from the petitioner to Northeast. Accordingly, he immediately had a deed drawn up, and he transferred title on the North Brookfield property to Northeast on November 26, 1963. In addition, on November 20, 1963, a special meeting of the stockholders of Northeast was held, and the minutes of that meeting show that the stockholders authorized the petitioner "to enter into all necessary agreements with respect to the purchase and/or financing of property owned by or to be conveyed to this Corporation," and ratified all acts theretofore performed by him with respect to such purchases or financing. Northeast deposited the proceeds of the loan from Finance in its bank account at U.S. Trust Co. on November 26, 1963, and during the remainder of 1963, the following transfers were made out of the proceeds: Payee
Amount
Manuel M. Koufman
$105,000.00
Legion Development Corporation (Legion)
61,000.00
Koufman Construction of Boston, Inc.
(KCB)
35,000.00
Apex Development Corporation (Apex)
15,000.00
East Coast
10,000.00
Brookline Development Corporation
(Brookline)
5,000.00
Total
$231,000.00
*87 The petitioner owned, in whole or in part, several other corporations, which he controlled. Set forth below is a list of such corporations, their approximate date of organization, and the petitioner's stock ownership therein, for the years in issue: Approximate Date
Petitioner's
Corporation
of Organization
Stock Ownership
Apex
July 17, 1963
100%
Brookline
June 27, 1963
100%
East Coast
June 9, 1959
50%
Eastern Region
Corporation (Eastern)
June 23, 1964
100%
KCB
May 17, 1953
100%
Koufman Development
Corporation (KDC)
March 27, 1956
50%
Legion
March 21, 1955
50% During the years in issue, none of these corporations, nor Northeast, declared any dividends. Prior to January 1, 1965, and subsequent thereto, the petitioner made withdrawals from, or advances of funds to, the corporations owned or controlled by him (collectively referred to as the corporations). Such withdrawals by him were reflected on the corporate records as accounts receivable, or as payments on their accounts payable to him. On the other hand, advances by him were treated by the corporations as credits on their accounts receivable from him, if there was any such account; *88 if not, then such advances were treated as additions to their accounts payable to him. The following chart sets forth the corporations' outstanding accounts with the petitioner and the amount determined by the Commissioner to constitute dividends to him during each of the years 1965 through 1969. An amount payable by the corporation to the petitioner is set forth in parentheses: 1965
Corporation
1/1/65
12/31/65
Dividend
12/31/66
Apex
$ (39,513.00)
$ 71,873.00
$ 137,488.00
Brookline
(12,081.00)
(11,932.00)
24,468.00
East Coast
(270,461.00)
(284,872.00)
81,519.00
200,950.00
330,788.00
236,518.00
KCB
3,657.00
320,667.00
43,590.00
KDC
196,342.00
175,902.00
188,620.00
Legion
567,561.17
623,251.99
$ 55,690.82
434,886.85
Northeast
674,624.12
674,424.12
674,924.12
Total
$1,321,079.29
$1,900,102.11
$1,822,013.97
1966
1967
Corporation
Dividend
12/31/67
Dividend
12/31/68
Apex
$65,616.00
$ 138,941.00
$ 1,452.00
$ 141,438.00
Brookline
24,468.00
26,518.00
2,050.00
41,642.00
East Coast
81,519.00
74,077.00
74,325.00
200,950.00
248,804.00
12,286.00
250,484.00
1,6 80.00
KCB
1,142.00
17,893.00
KDC
12,717.00
242,607.00
53,987.00
258,171.00
Legion
434,273.96
399,033.85
Northeast
500.00
675,216.12
675,030.41
Total
$1,841,579.08
$1,858,017.26
*89 1968
1969
Corporation
Dividend
12/31/69
Dividend
Apex
$ 2,497.00
$ 158,204.00
$ 16,766.00
Brookline
15,124.00
40,945.00
East Coast
248.00
74,687.00
362.00
$6Eastern
200,950.00
257,008.00
6,524.00
KCB
16,752.00
20,931.00
3,038 .00
KDC
15,564.00
259,752.00
1,580.00
Legion
398,658.29
Northeast
675,589.41
Total
$1,885,774.70
The petitioner paid no interest on the amounts treated as accounts receivable by the corporations, nor did the corporations pay any interest on amounts which were treated as payable to him. He testified that every time an advance was made to him, he executed a note for the amount of the advance, and he produced some of such notes; other notes could not be produced because they were kept in a safe that was stolen. None of the notes produced by him had a fixed maturity date--some were payable on demand, and others did not mention when they were payable. No evidence was introduced to suggest that there was any limit on the amount of advances which would be made by any one of the corporations or by all of the corporations. During the taxable years in issue, the petitioner's adjusted gross income *90 was as follows: Year
Adjusted Gross Income
1963
$ 33,863.39
1965
52,580.65
1966
68,776.37
1967
39,002.56
1968
4,982.00
1969
5,597.00
During the 1960's, the corporations incurred increases in real estate taxes and the costs for insurance, money, and maintenance, which could not be passed along to the tenant under the terms of the lease, and the petitioner sustained several personal tragedies. In October 1963, his younger brother died of Hodgkin's disease, and during the following 11 months, the petitioner's youngest son took ill and died. The death of his son took the petitioner by surprise since he was not aware that his son would not recover. Then, in approximately August 1965, his father died. All of these events made the petitioner less attentive to business matters. He developed a condition described as "cluster headaches" which he had three or four times a day and at night. Each headache lasted for about 40 minutes, caused the petitioner tremendous discomfort, and rendered him substantially disabled for a period of time. During the period 1965 through 1969, there were numerous transfers between the corporations. The following chart sets *91 forth, for such years, the accounts of each of the corporations and the amounts determined by the Commissioner to constitute constructive dividends to the petitioner. An amount payable by the corporation is set forth in parentheses: 1965
1/1/65
12/31/65
Dividend
12/31/66
Accounts of Apex
Brookline
$ (400.00)
$ (2,988.00)
$ (2,937.00)
East Coast
(10,867.00)
(21,062.00)
(23,654.00)
Eastern
(729.00)
(529.00)
1,971.00
KCB
(15,073.00)
(17,917.00)
(18,1 59.00)
KDC
(1,500.00)
5,500.00
Legion
(1,300.00)
(24,111.00)
(21,711.00)
Northeast
(16,500.00)
(16,500.00)
(15,300.00)
Total
$ (46,369.00)
$ (83,107.00)
$ (74,290.00)
Accounts of Brookline
Apex
$ 400.00
$ 2,988.00
$ 2,937.00
East Coast
(3,811.00)
(3,811.00)
(594.00)
Eastern
15,107.00
12,007.00
11,507.00 KCB
(10,550.00)
(10,950.00)
(11,279.00)
KDC
1,500.00
Legion
(6,600.00)
(6,600.00)
(6,100.00) Northeast
(5,000.00)
(5,000.00)
(5,000.00)
Total
$ (10,454.00)
$ (11,366.00)
$ (7,029.00)
Accounts of East
Coast
Apex
$ 10,867.00
$ 21,063.00
$ 23,654.00
Brookline
3,811.00
3,811.00
594.00
Eastern
(321,125.00)
(186,808.00)
73,1 78.00
KCB
(67,873.00)
(139,773.00)
(408,537.00)
KDC
16,256.00
16,256.00
16,186.00
Legion
(56,640.00)
(67,140.00)
(54,609.00)
Northeast
275,466.00
276,852.00
276,852.00
Total
[139,238.00)
$ (75,739.00)
$ (72,682.00)
Accounts of Eastern
Apex
$ 729.00
$ 529.00
$ (1,971.00)
Brookline
(15,107.00)
(12,007.00)
(11,507.00)
East Coast
321,125.00
186,808.00
(73,178.00)
KCB
1,000.00
11,881.00
(58,512.00)
KDC
16,842.00
Legion
4,250.00
(5,450.00)
Northeast
450.00
Total
$ 307,747.00
$ 191,461.00
[133,326.00)
Accounts of KCB
Apex
$ 15,073.00
$ 17,917.00
$ 2,844.00
$ 18,160.00
Brookline
10,620.00
10,950.00
330.00
11,279.00
East Coast
67,873.00
139,773.00
71,900.00
408,537.00
Eastern
(1,000.00)
(11,881.00)
58,512.00
K DC
38,963.00
28,813.00
23,763.00
Legion
76,952.00
75,702.00
79,91 1.00
Northeast
(26,524.00)
(26,524.00)
(25,743.00)
Total
$ 181,957.00
$ 234,750.00
$ 574,419.00
Accounts of KDC
Apex
$ 1,500.00
$ (5,500.00)
Brookline
(1,500.00)
East Coast
(16,256.00)
$ (16,256.00)
(16,186.00)
Eastern
(16,842.00)
KCB
(41,563.00)
(28,813.00)
(23,763.00)
Legion
9,588.00
11,588.00
$ 2,000.00
19,918.00
Northeast
Total
$ (46,731.00)
$ (33,481.00)
$ (43,873.00)
Accounts of Legion
Apex
$ 811.12
$ 24,111.12
$23,300.00
$ 21,711.12
Brookline
6,600.00
6,600.00
6,100.00
East Coast
56,639.86
67,139.86
10,500.00
54,608.77
Eastern
(4,250.00)
5,450.00
KCB
(76,952.53)
(75,702.53)
(79,911.29)
KDC
(9,588.11)
(11,588.11)
(19,918.11)
Northeast
(73,350.00)
(72,950.00)
(72,950.00)
Total
[95,839.66)
$ (66,639.66)
$ (84,909.51)
Accounts of Northeast
Apex
$ 16,500.00
$ 16,500.00
$ 15,300.00
Brookline
5,000.00
5,000.00
5,000.00
East Coast
(275,465.79)
(276,851.89)
(276,851.89)
E astern
(450.00)
KCB
26,523.61
26,523.61
(25,742.79)
KDC
Legion
73,350.00
72,950.00
72,950.00
Total
[154,092.18)
[155,878.28)
[209,794.68)
*92 1966
1967
Dividend
12/31/67
Dividend
12/31/68
Accounts of Apex
Brookline
$ (2,937.00)
$ (2,867.00)
East Coast
(23,654.00)
(23,654.00)
Eastern
$ 1,971.00
1,971.00
1,971.00
KCB
(19,300.00)
(22,141.00)
KDC
(3,200.00)
(3,200.00)
Legion
(22,761.00)
(22,561.00)
Northeast
(15,300.00)
(15,300.00)
Total
$ (85,181.00)
$ (87,752.00)
Accounts of Brookline
Apex
$ 2,937.00
$ 2,867.00
East Coast
(594.00)
(594.00)
Eastern
11,507.00
11,507.00
KCB
(10,429.00)
(11,598.00)
KDC
$ 1,500.00
1,500.00
1,500.00
Legion
(6,100.00)
(6,100.00)
Northeast
(5,000.00)
(5,000.00)
Total
$ (6,179.00)
$ (7,418.00)
Accounts of East
Coast
Apex
$ 2,592.00
$ 23,654.00
$ 23,654.00
Brookline
594.00
594.00
Eastern
73,178.00
72,878.00
70,528.00
KCB
(339,137.00)
(341,237.00)
KDC
16,286.00
$ 100.00
16,286.00
Legion
(54,609.00)
(54,609.00)
Northeast
276,852.00
276,852.00
Total
$ (3,482.00)
$ (7,932.00)
Accounts of Eastern
Apex
$ (1,971.00)
$ (1,971.00)
Brookline
(11,507.00)
(11,507.00)
East Coast
(72,878.00)
(70,528.00)
KCB
(58,462.00)
(58,702.00)
KDC
$ 16,842.00
16,842.00
10,842.00
Legion
(5,450.00)
(5,150.00)
Northeast
450.00
450.00
450.00
Total
[132,976.00)
[136,566.00)
Accounts of KCB
Apex
$ 242.00
$ 19,300.00
$ 1,140.00
$ 22,141.00
Brookline
329.00
10,429.00
11,598.00
East Coast
268,764.00
339,137.00
341,237.00
Eastern
58,512.00
58,462.00
58,702.00
K DC
10,563.00
10,963.00
Legion
4,209.00
84,361.00
4,450.00
83,783.00
Northeast
(25,643.00)
(25,643.00)
Total
$ 496,609.00
$ 502,781.00
Accounts of KDC
Apex
$ 3,200.00
$ 3,200.00
$ 3,200.00
Brookline
(1,500.00)
(1,500.00)
East Coast
(16,286.00)
(16,286.00)
Eastern
(16,842.00)
(10,842.00 )
KCB
(10,563.00)
(10,963.00)
Legion
$ 8,330.00
23,918.00
4,000.00
23,918.00
Northeast
(150.00)
(150.00)
Total
$ (18,223.00)
$ (12,623.00)
Accounts of Legion
Apex
$ 22,761.12
$ 1,050.00
$ 22,561.12
Brookline
6,100.00
6,100.00
East Coast
54,608.77
54,608.77
Eastern
$ 5,450.00
5,450.00
5,150.00
KCB
(84,361.29)
(83,782.99)
KDC
(23,918.11)
(23,918.11)
Northeast
(73,200.00)
(73,200.00)
Total
$ (92,559.51)
$ (92,481.21)
Accounts of Northeast
Apex
$ 15,300.00
$ 15,300.00
Brookline
5,000.00
5,000.00
East Coast
(276,851.89)
(276,851.89)
E astern
(450.00)
(450.00)
KCB
25,642.79
25,6 42.79
KDC
150.00
150.00
Legion
73,200.00
7 3,200.00
Total
[158,009.10)
[158,009.10)
*93 1968
1969
Dividend
12/31/69
Dividend
Accounts of Apex
Brookline
$ (2,867.00)
East Coast
(23,654.00)
Eastern
1,971.00
KCB
(23,204.00)
KDC
(3,200. 00)
Legion
(22,551.00)
Northeast
(15,300.00)
Total
$ (88,805.00)
Accounts of Brookline
Apex
$ 2,867.00
East Coast
(594.00)
Eastern
11,507.00
KCB
(12,536.00)
KDC
1,500.00
Legion
(6,100.00)
Northeast
(5,000.00)
Total
$ (8,356.00)
Accounts of East
Coast
Apex
$ 23,654.00
Brookline
594.00
Eastern
69,578.00
KCB
(341,702.00)
KDC
16,286.00
Legion
(54,609.00)
Northeast
276,852.00
Total
$ (9,347.00)
Accounts of Eastern
Apex
$ (1,971.00)
Brookline
(11,507.00)
East Coast
(69,578.00)
KCB
(59,527.00)
KDC
10,842.00
Legion
(5,139.00)
Northeast
450.00
Total
[136,430.00)
Accounts of KCB
Apex
$ 2,841.00
$ 23,204.00
$ 1,062.00
Brookline
1,169.00
12,537.00
939.00
East Coast
2,100.00
341,702. 00
466.00
Eastern
240.00
59,527.00
825.00
K DC
400.00
10,963.00
Legion
85,230.00
1,420.00
Northeast
(26,393.00)
Total
$ 506,770.00
Accounts of KDC
Apex
$ 3,200.00
Brookline
(1,500.00)
East Coast
(16,286.00)
Eastern
(10,842.00)
KCB
(10,963.00)
Legion
23,918.00
Northeast
(150.00)
Total
$ (12,623.00)
Accounts of Legion
Apex
$ 22,551.12
Brookline
6,100.00
East Coast
54,608.77
Eastern
5,139.50
KCB
(85,230.26)
KDC
(23,918.11)
Northeast
(73,205.00)
Total
$ (93,953.98)
Accounts of Northeast
Apex
$ 15,300.00
Brookline
5,000.00
East Coast
(276,851.89)
E astern
(450.00)
KCB
26,392.79
KDC
150.00
Legion
73,205.00
Total
[157,254.10)
*94 The intercorporate transfers were consistently treated as loans by the corporations.The transferor treated the advances as assets on its books and records, and the transferee treated the advances as liabilities. Notes were executed for each advance, although interest was not paid, and there is no evidence that any security was given for the advances. The excess mortgage proceeds were often the source of the funds which were loaned by one corporation to another. The advances were made to enable the borrowing corporation to engage in additional projects. During the years in issue, Charlotte Koufman was a housewife and was not employed. She received all of her funds from her husband, except for an interest in a trust set up by her father from which she never received income in excess of $2,000 a year. She had her own checking account from which she paid the household bills. Her checkbook covering the period May 10, 1963, through January 22, 1964, was introduced into evidence, and it showed that, on an average, checks totaling $900 were written per month. However, she "charged mostly everything and I got what I needed as I went along," and Mr. Koufman paid for the charges. *95 No evidence was offered to establish the amounts Mrs. Koufman charged during the years in question, or whether there was a limit set on the amounts she could charge. She testified that she purchased some jewelry, but "[it] wasn't anything important that I could actually remember." She further testified that she did not believe that she purchased any fur coats in that period, but she might have purchased a jacket. During the years in issue, she was supplied with a Cadillac by her husband, and she had the services of at least one maid, and two on occasion. In August 1969, the petitioners entered into an agreement with the Commissioner which purported to extend until December 31, 1970, the time for assessing a deficiency with respect to 1963. Subsequent waivers were executed which purported to extend the time for such an assessment until December 31, 1972. The notice of deficiency for 1963 and 1965 was mailed to the petitioners on August 23, 1972. Another notice was subsequently sent to the petitioners with respect to the years 1966 through 1969. In those notices of deficiency, the Commissioner determined that for 1963, the petitioners failed to report a dividend received *96 from Legion in the amount of $33,245.03, rental income which they received from Kleven, a gain realized on the transfer of the North Brookfield property to Northeast, and distributions which they received as a result of the transfers from Northeast to the petitioner and to his other corporations in that year. The Commissioner also determined that the petitioner received dividends from his corporations in 1965 through 1969 as a result of certain withdrawals by him from such corporations and as a result of certain transfers between the corporations.
OPINION 1. Transactions in 1963
The petitioners take the position that the statute of limitations has run and prevents the assessment of any deficiency for 1963. They point out that the Commissioner did not send them a notice of deficiency within 3 years after the filing of the return for that year and that the agreement purporting to extend the time for assessing a deficiency with respect to such year was executed more than 5 years after the return was filed. Accordingly, they argue that the agreement was void and that the notice of deficiency came too late. The Commissioner, on the other hand, contends that the 6-year statute *97 of limitations was applicable to an assessment with respect to 1963 and that the agreement was executed within such period. Section 6501(a) establishes, as a general rule, that an assessment of a deficiency must be made within 3 years after the return is filed, and section 6503 provides that if a notice of deficiency is mailed to the taxpayer within that period, the running of the statute of limitations is suspended. Whirlpool Corp.,61 T.C. 182 (1973). There are exceptions to the general rule of section 6501(a), and one of those is contained in section 6501(e)(1)(A), which allows an assessment to be made within 6 years after the filing of the return "[if] the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return." Section 6501(c)(4) provides that the time for the assessment of a deficiency may be extended by an agreement between the taxpayer and the Commissioner, if such agreement is executed within the period for making assessment. Kohlhase v. Commissioner,181 F. 2d 331, 335 (6th Cir. 1950), *98 revg. on another ground 12 T.C. 725 (1949); Elmer M. Melahn,9 T.C. 769, 777-778 (1947); see Diamond Gardner Corp.,38 T.C. 875, 881 n. 6 (1962).When the Commissioner relies on the 6-year statute of limitations, he has the burden of proving the 25-percent omission from income. William G. Stratton,54 T.C. 255, 289 (1970); Philipp Bros. Chemicals, Inc. (Md.),52 T.C. 240, 254 (1969), affd. 435 F. 2d 53 (2d Cir. 1970); Gaylord C. Peters,51 T.C. 226, 230 (1968). We will now consider the several transactions which the Commissioner has determined constitute such an omission from income. a. Dividend from Legion
In support of his determination that the petitioner received a dividend from Legion in 1963, the Commissioner contends that the petitioner admitted receiving such a dividend and should be bound by his admission. The Commissioner offered no evidence to establish directly that the petitioner had received a dividend; instead, the Commissioner relied on the testimony of an agent who had not conducted the initial audit of the petitioners' return for 1963 and *99 who had no first-hand knowledge of the alleged admission. The testimony is as follows: Q As a result of your examination, your audit of Northeast, did you become aware of a possibility of adjustments to the return of its sole shareholder, Mr. Koufman, for the taxable year 1963? A Yes, sir. Q Were you aware of the fact that there had been -- that another agent had looked at Mr. Koufman's books and records? A Yes, sir. Q I'd like to refer the Court to Exhibit 1-A. Would you indicate to the Court what the results of that audit were? A Prior examination resulted in an additional deficiency of $8969.00 and I believe from the label eighty-eight cents. And this was assessed December 30, 1966. Q Was this assessment attributable to additional income that Mr. Koufman agreed that he had received? A From my review of the prior Revenue Agent's report, yes. Q Would the approximate amount of this additional income be $33,254.03? A Yes, sir. The agent who actually conducted the audit was not called to testify, nor was the petitioner questioned about the alleged agreement or the circumstances surrounding it, even though he took the stand and was cross-examined by the *100 counsel for the Commissioner. The agent's testimony is based exclusively on the prior agent's report, which was never admitted into evidence and which constitutes an out-of-court declaration by the prior agent. Thus, such testimony is hearsay, since it is offered to prove that the petitioner in fact made such statements and that they are accurately and truthfully presented in such report. Rule 801(c), Federal Rules of Evidence (F.R.E.). Hearsay is generally inadmissible (Rule 802, F.R.E.), but since the petitioners did not object to the admissibility of such hearsay, it was admitted as evidence for whatever probative value it may have. McCormick, Evidence, sec. 54 (1954); cf. Rule 103(a), F.R.E.
In other situations, we have rejected attempts by a party to rely on an agent's report to establish the truth of the matters stated therein. See Victor Blanco,56 T.C. 512, 515 (1971); James H. Fitzner,31 T.C. 1252, 1255 (1959); J. Paul Blundon,32 B.T.A. 285, 288-289 (1935). Since the agent who wrote such report was not called as a witness, the statements in the report are completely unverified and have not been subject to cross-examination. *101 Moreover, we have no idea as to how long after the agent interviewed the petitioner he wrote his report. Finally, the report does not set forth in clear terms that the petitioner admitted receiving a dividend of $33,254.03 from Legion in 1963. In short, we find that the testimony based upon such report is untrustworthy and unconvincing and fails to carry the Commissioner's burden of proving an admission by the petitioner that he received such a dividend. Cf. Hartzog v. United States,217 F. 2d 706 (4th Cir. 1954). b. Rental Income from the North Brookfield Property
The Commissioner argues that Northeast cannot be considered for tax purposes the owner of the North Brookfield property until November 26, 1963, the date legal title was transferred to it, and that, therefore, the petitioners are taxable on the rental income received from that property before such date. The petitioner's position is that he held the property on behalf of Northeast, after its incorporation in 1962, and consequently, it should be considered the owner for Federal income tax purposes in 1962. *102 The issue of who is the owner of property for Federal income tax purposes is a question of fact which must be determined upon an examination of all the facts and circumstances. Schoenberg v. Commissioner,302 F. 2d 416 (8th Cir. 1962), affg. a Memorandum Opinion of this Court; Gouldman v. Commissioner,165 F. 2d 686 (4th Cir. 1948), affg. a Memorandum Opinion of this Court; Irving Snyder,66 T.C. 785 (1976); Amelia J. Taylor,27 T.C. 361 (1956), affd. 258 F. 2d 89 (2d Cir. 1958). Upon a review of all the facts and circumstances in this case, we are convinced that by the end of 1962, Northeast was the owner of the North Brookfield property for tax purposes. It was the petitioner's testimony that upon the organization of Northeast in the latter part of 1962, he was holding the property as its nominee. Such a relationship is not dependent upon a formal arrangement between the parties, but will be found whenever it is shown that such an arrangement in fact existed. Ross Glove Co.,60 T.C. 569, 592 (1973). The petitioner's testimony on this issue was consistent with all the other *103 circumstances, and we found it to be credible and reliable. All of the objective facts corroborate the petitioner's testimony that Northeast was the real owner of the property. All the rental payments from Kleven, including those for November and December 1962, were deposited in Northeast's bank account and were reported as its income on its Federal income tax returns.All of the expenses incurred in connection with the management of the Kleven lease, as well as all of the mortgage payments on the North Brookfield property, were paid by Northeast. It was Northeast which claimed depreciation on such property beginning with December 1962 and reported on its initial return that it acquired such property in 1962. Furthermore, Prudential, which was involved with the financing of the property, was informed in 1962 by the petitioner that Northeast was going to lease the property to Kleven, and its release of him from any personal liability can be explained on the basis that it considered Northeast to be the owner of the property. In addition, during the loan negotiations with Finance, all of the parties thought that Northeast held legal title to the property, since in every respect *104 it acted as the owner of the property. Finally, it was consistent with the petitioner's customary method of conducting his business to organize a new corporation for a new project and to transfer the property to it, and the failure to do so in 1962 is explainable by the illness of his brother. All of these facts and circumstances unmistakably show that it was Northeast which controlled the North Brookfield property, enjoyed its profits, and assumed the economic obligations with respect to it.These facts, combined with the petitioner's uncontradicted testimony that he intended to act as nominee for Northeast and that he did so upon its incorporation, persuade us that Northeast is to be considered the owner of such property, for Federal income tax purposes, prior to 1963. It follows that the petitioner is not taxable on the rental income derived from such property and is not entitled to the business deductions in connection therewith, and we so hold. c.Gain on the Transfer of the North Brookfield Property
The Commissioner contends that when the petitioner transferred the legal title to the North Brookfield property to Northeast in 1963, he realized a gain taxable to him *105 under section 357(c). Since we have already concluded that Northeast became the beneficial owner of such property in 1962, the transfer of bare legal title in 1963 could not result in a gain taxable under section 357(c), but there is an additional reason for reaching the same conclusion. Section 351 provides that certain transfers to controlled corporations are not taxable, but section 357(c)(1), in relevant part, provides: In the case of an exchange-- (A) to which section 351 applies, * * * if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be. In contending that such provision is applicable to the transfer of the North Brookfield property to Northeast, the Commissioner points out that the basis of such property was $1,073,151.44 on November 26, 1963, the date Northeast *106 acquired legal title, and the liabilities assumed by Northeast on that date were $1,332.411.86. However, to apply such provision, it is necessary to take into consideration the basis of all assets transferred ( sec. 1.357-2(a), Income Tax Regs. ; Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.07, p. 3-28 (3d ed.)), and the balance sheets attached to Northeast's returns suggest that the entire proceeds of the loan obtained from Shawmut were transferred to Northeast. In the light of such evidence, it is clear that the Commissioner has failed to carry his burden of showing that the liabilities assumed by Northeast exceeded the basis of the property acquired by it in the transfer. d. Collapsible Corporation Distributions
The Commissioner argues that when Northeast borrowed the funds from Finance in 1963 and transferred some of those funds to the petitioner and to corporations owned or controlled by him, Northeast thereby made distributions to him, taxable under section 341(a). Such section provides in relevant part: *107 (a) Treatment of Gain to Shareholders.--Gain from-- * * *
(3) a distribution made by a collapsible corporation which, under section 301(c)(3)(A), is treated, to the extent it exceeds the basis of the stock, in the same manner as a gain from the sale or exchange of property, to the extent that it would be considered (but for the provisions of this section) as gain from the sale or exchange of a capital asset held for more than 6 months shall, except as otherwise provided in this section, be considered as gain from the sale or exchange of property which is not a capital asset.
In the first place, we hold that the Commissioner has failed to carry his burden of proving that such transfers by Northeast were distributions to the petitioner within the meaning of section 341(a). It is well settled that for purposes of section 301, a genuine loan to a shareholder is not a "distribution" to him, but if it is found that a withdrawal by a shareholder in the form of a loan is in reality a distribution to him, it is taxable to him under section 301.E.g., Alterman Foods, Inc. v. United States,505 F. 2d 873, 875 (5th Cir. 1974); *108 Berthold v. Commissioner,404 F. 2d 119, 121 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; Victor Shaken,21 T.C. 785, 792-793 (1954); Carl L. White,17 T.C. 1562, 1568-1569 (1952). All the evidence in this case supports the conclusion that the transfers by Northeast to the petitioner in 1963 were genuine loans. Both the petitioner and Northeast consistently treated the transfers as loans. The petitioner testified that he gave notes for the loans, and some of such notes were presented by him. Northeast treated the transfers as resulting in accounts receivable from the petitioner. In connection with these transfers, unlike those occurring in later years, we have no evidence to indicate that the petitioner could not reasonably expect to repay the loans. In 1963, his adjusted gross income was $33,863.39, and with that income, we cannot say that he could not repay such loans. We have no evidence as to other obligations the petitioner may have had in 1963. The Commissioner offered no evidence to support his contention that the transfers to the petitioner in 1963 were distributions, and on this record, it is clear *109 that the Commissioner has failed to carry his burden of proof. In like manner, the Commissioner has failed to establish that the funds which Northeast transferred in 1963 to the other corporations owned or controlled by the petitioner were distributions to him. Such transfers were in the form of loans, and there is no evidence to indicate that they were not genuine.Since the transfers to those other corporations were genuine loans, they could not constitute constructive dividends to the petitioner. See Rapid Electric Co.,61 T.C. 232 (1973); Walter K. Dean,57 T.C. 32 (1971); W. B. Rushing,52 T.C. 888 (1969), affd. on another ground 441 F. 2d 593 (5th Cir. 1971). Not only has the Commissioner failed to establish that the transfers by Northeast were distributions to the petitioner, but he has also failed to prove that Northeast was a collapsible corporation in 1963. In relevant part, section 341(b)(1) defines a "collapsible corporation" as: (b) Definitions-- (1) Collapsible corporation.-- For purposes of this section, *110 the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to-- (A) * * * a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and (B) the realization by such shareholders of gain attributable to such property. Since we have found that the transfers by Northeast to the petitioner and to the other corporations in 1963 were not distributions to him, it follows that such transfers are insufficient to prove that Northeast was "formed or availed of, with a view to * * * a distribution to its shareholders," and therefore Northeast was not a collapsible corporation within the meaning of that provision. Nor has the Commissioner established that Northeast was a collapsible corporation by reason of the rebuttable presumption contained in *111 section 341(c)(1), which provides in relevant part: (c) Presumption in Certain Cases--(1) In general.--For purposes of this section, a corporation shall, unless shown to the contrary, be deemed to be a collapsible corporation if (at the time of * * * the distribution, described in subsection (a)) the fair market value of its section 341 assets * * * is-- (A) 50 percent or more of the fair market value of its total assets, and (B) 120 percent or more of the adjusted basis of such section 341 assets. The building on the North Brookfield property was a section 341 asset (section 341(b)(3)(D)), and the parties assume that such building was Northeast's only such asset. The basis of such building on the date of the alleged distributions was $1,054,188.24. The Commissioner offered no direct evidence as to the value of such building; instead, he points to the fact that after the loan from Finance was secured by Northeast, the North Brookfield property was subject to total liabilities of $1,592,411.86, and he argues that from such liabilities, we should infer that the fair market value of *112 the property was more than 120 percent of its basis. However, we find such evidence to be unpersuasive. The loan from Finance was also endorsed by the petitioner, and the loan from Prudential was secured by an assignment of the Kleven lease which was endorsed by Genesco. In addition, both the land and the building were subject to the liabilities, and the Commissioner has not demonstrated how any appreciation in the value of such property is to be allocated between the land and the building. In the light of those circumstances, we hold that the Commissioner's evidence is insufficient to establish the fair market value of the North Brookfield property, and accordingly, he has failed to satisfy section 341(c). In summary, the Commissioner has failed to carry his burden of proof with respect to the transactions on which he relied to show that the petitioners had omitted more than 25 percent of their gross income for 1963. Accordingly, the 3-year statute of limitations was applicable with respect to that year, and the extension agreement, executed by the petitioners beyond that period of time, was ineffective. Sec. 6501(c)(4). 2. Withdrawals by the Petitioner in 1965-1969
*113 The next issue we must decide is whether certain withdrawals made by the petitioner from the corporations owned or controlled by him during the period 1965 through 1969 were bona fide loans or were corporate distributions to him within the meaning of section 301. As we observed earlier, the issue of whether shareholder withdrawals are bona fide loans is a question of fact which requires consideration and evaluation of the surrounding circumstances. Alterman Foods, Inc. v. United States,505 F. 2d 873, 875-876 (5th Cir. 1974); Berthold v. Commissioner,404 F. 2d 119, 121 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; Chism'sEstate v. Commissioner,322 F. 2d 956, 960 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Victor Shaken,21 T.C. 785, 792 (1954). In making such examination, it is of controlling significance to inquire whether the parties intended to create bona fide indebtedness which the shareholder intended to repay and which the corporation intended to collect. Chism's Estate *114 v. Commissioner,supra at 960; Electric & Neon, Inc.,56 T.C. 1324, 1338-1339 (1971), affd. without opinion 496 F. 2d 876 (5th Cir. 1974); Jack Haber,52 T.C. 255, 266 (1969), affd. per curiam 422 F. 2d 198 (5th Cir. 1970); Elliott J. Roschuni,29 T.C. 1193, 1201-1202 (1958), affd. per curiam 271 F. 2d 267 (5th Cir. 1959), cert. denied 362 U.S. 988 (1960). In discerning the parties' intention, the courts have relied on objective indicia, particularly when, as here, the withdrawals are made by a dominant or sole shareholder. Alterman Foods, Inc. v. United States,supra at 877; Berthold v. Commissioner,supra at 122; Electric & Neon, Inc.,supra at 1339. Consequently, declarations made by the parties that a loan was intended are not controlling. Alterman Foods, Inc. v. United States,supra at 876-877; Berthold v. Commissioner,supra at 122; Ben R. Meyer,45 B.T.A. 228, 240-241 (1941). One significant objective criterion is whether the shareholder, at the time *115 of the advance, could reasonably have expected to repay it. Commissioner v. Makransky,321 F. 2d 598, 600-601 (3d Cir. 1963), affg. 36 T.C. 446 (1961); Regensburg v. Commissioner,144 F. 2d 41, 44 (2d Cir. 1944), affg. a Memorandum Opinion of this Court, cert. denied 323 U.S. 783 (1944); Electric & Neon, Inc.,supra at 1339; Irving D. Fisher,54 T.C. 905, 910 (1970). It is also helpful to inquire whether evidences of indebtedness were executed, whether security was given for the withdrawals, and whether interest was paid. Walter K. Dean,57 T.C. 32, 45 (1971); Jack Haber,52 T.C. at 266; Elliott J. Roschuni,29 T.C. at 1202. The courts have also considered whether the indebtedness was due by a date certain, whether there was a fixed total limit on a shareholder's borrowings, and the amount of repayments made. Alterman Foods, Inc. v. United States,505 F. 2d at 878; Berthold v. Commissioner,404 F. 2d at 122; William C. Baird,25 T.C. 387, 395 (1955). However, it must be kept in mind *116 that the presence or absence of any of these indicia is not determinative; they are just helpful guideposts for the trier of fact who must determine, based upon all of the evidence, the crucial fact of whether repayment was actually intended. In this case, there was no fixed date for the repayment of the amounts withdrawn from the corporations by the petitioner; there was no limit on the amount that could be withdrawn by him; no security was given for the alleged loans, and no interest was charged; and during the years at issue, the corporations paid no dividends. All these circumstances tend to indicate that there was no bona fide intention to repay the withdrawals, but an analysis of the relationship between the amount of the withdrawals and the petitioner's ability to repay them provides even clearer indication of the lack of such intention. At the beginning of 1965, the net amount owed by the petitioner to his corporations exceeded $1,300,000; in 1965, his withdrawals exceeded his repayments by over $500,000, so that by the end of that year, the net amount of his obligations to his corporations exceeded $1,900,000. Although he reduced the net amount of such obligations by *117 more than $78,000 in 1966, the balance increased by close to $20,000 in 1967; by over $16,000 in 1968; and by more than $27,000 in 1969. In 1965-1969, the petitioner's largest annual adjusted gross income was approximately $68,000 in 1966, and in some years it was substantially smaller. He has given no other source that might be used to repay the withdrawals from the corporations, and it is quite clear that such funds are altogether inadequate to repay obligations of such magnitude. In the light of such facts, we must find that there was no reasonable or realistic expectation that the petitioner could repay the withdrawals from his corporations. The petitioner argues that we should not judge his ability to repay by what actually happened in 1965 through 1969; he asserts that at the beginning of such period, his prospects were more favorable, but that his personal tragedies adversely affected his businesses. However, he has furnished no evidence to support his assertion that his prospects were in fact more favorable at the beginning of 1965, therefore, we must rely upon the events that did occur. He also contends that both he and the corporations strictly adhered to all the *118 formalities of treating the withdrawals as loans to him, but when, as here, the shareholder controls the corporations, such evidence bears little weight. Alterman Foods, Inc. v. United States,505 F. 2d at 878; Elliott J. Roschuni,29 T.C. at 1203; William C. Baird,25 T.C. at 395; W. T. Wilson,10 T.C. 251, 256 (1948), affd. sub nom. Wilson Bros. & Co. v. Commissioner,170 F. 2d 423 (9th Cir. 1948), cert. denied 336 U.S. 909 (1949). Similarly, the fact that the petitioner made a number of repayments is entitled to little weight, especially when, as here, the total amount of the withdrawals steadily increased. Regensburg v. Commissioner,144 F. 2d at 44; Electric & Neon, Inc.,56 T.C. at 1339; Elliott J. Roschuni,29 T.C. at 1202; Ben R. Meyer,45 B.T.A. at 240. In our judgment, the facts relied upon by the petitioner are not sufficient to convince us that there was a bona fide intention to repay the withdrawals in 1965 through 1969, and therefore, as to those withdrawals found by the Commissioner to be corporate *119 distributions, we sustain his determination. 3. Intercorporate Transfers in 1965-1969
The next issue to be decided is whether certain intercorporate transfers, between the corporations owned or controlled by the petitioner, were bona fide loans or contributions of capital which resulted in constructive dividends to him. In deciding such issue, we are guided by the same principles considered in our analysis of the preceding issue. The essential question for the trier of fact is whether the transferee corporation intended to repay the transfer, and whether the transferor intended to require payment. Joseph Lupowitz Sons, Inc. v. Commissioner,497 F. 2d 862, 868 (3d Cir. 1974), affg. on this issue a Memorandum Opinion of this Court. Although the governing principles are the same, there is a significant difference in the facts regarding the intercorporate transfers, and that difference leads to a different conclusion. We start with the premise that each corporation, although related by a common shareholder, is a separate and viable entity which must be respected. *120 Joseph Lupowitz Sons, Inc. v. Commissioner,supra;Rapid Electric Co.,61 T.C. 232, 240 (1973); W. B. Rushing,52 T.C. 888 (1969), affd. on another ground 441 F. 2d 593 (5th Cir. 1971). It is their actions and intentions which are of controlling significance in evaluating the nature of the intercorporate transfers. Many of the facts regarding the intercorporate transfers are similar to those relating to the petitioner's withdrawals: On the one hand, there was no fixed due date, no security was given, and no interest was paid on such transfers. On the other hand, the transfers were consistently treated by the transferor and the transferee as loans. The significant difference between the intercorporate transfers and the withdrawals by the petitioner is found when we consider the ability to repay and the consistency and substantiality of the repayments. See Joseph Lupowitz Sons, Inc. v. Commissioner,497 F. 2d at 868. In the case of the intercorporate transfers, there is no continuing increase in the indebtedness of one corporation to another, and no corporation has become so deeply indebted *121 to another as to indicate that the transfers could not be repaid. Because of this difference, there is no reason to doubt that each of the corporations expected to repay the amounts transferred to it, and accordingly, we are satisfied that the transfers in 1965 through 1969 gave rise to bona fide loans. 4. Applicability of the Innocent Spouse Provision of Section 6013(e)
The last issue for decision is whether the petitioner, Charlotte Koufman, may be relieved of liability for the deficiencies attributable to the gross income which we have found to have been omitted by her husband during the years 1965 through 1969. Section 6013(e)(1) provides: (1) In general.--* * * if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, *122 such omission, and (C) taking into account whether or not the other spouse significantly benefitted directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such emission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. The Commissioner does not dispute that Mrs. Koufman met the requirements of section 6013(e)(1)(A) and (B); thus, the decision turns on whether Mrs. Koufman benefitted from omissions of income within the meaning of section 6013(e)(1)(C). A spouse seeking relief under section 6013(e) has the burden of proving that she qualifies for such relief. Blaine S. Fox,$3 61 T.C. 704, 716 (1974);Nathaniel M. Stone,56 T.C. 213, 227 (1971); see Howard B. Quinn,62 T.C. 223, 231 n. 5 (1974), *123 affd. 524 F. 2d 617 (7th Cir. 1975). In this case, she has made no effort to trace the omitted income and to show that she received none of it.Compare Jerome J. Sonnenborn,57 T.C. 373, 382-383 (1971).Instead, she has sought to establish merely that she received no unusual benefits from her husband, but the evidence presented by her is too scanty and incomplete to carry her burden of proof. Mr. Koufman supplied his wife with the funds in her checking account, which was used to pay household expenses. She wrote, on the average, $900 worth of checks a month during the period in issue. However, she testified that she charged "mostly everything" and that her husband paid her charges. No evidence was introduced to establish or even suggest the total amount of such charges or the items which were charged. Nothing of record suggests that there was any limit on the amount that she could charge. During the period in issue, she drove a late model Cadillac which was furnished by her husband. She employed usually one and sometimes two maids, and she purchased some jewelry. For aught that appears in the record, it might well be that the amount of charges *124 and other items supplied or paid by Mr. Koufman for his wife was far beyond the ability of one who made only the amounts of income reported by him on his Federal income tax returns. Nor can we say that his support of her was limited to "ordinary support." S. Rept. No. 91-1537 (1970), 1971-1 C.B. 606, 607; cf. Patricia E. Mysse,57 T.C. 680, 699 (1972). On this record, we are simply unable to conclude that the petitioners have shown that Mrs. Koufman did not significantly benefit from her husband's withdrawals during the years in issue. See Raymond H. Adams,$3 60 T.C. 300, 302 (1973);Jerome J. Sonnenborn,supra.Consequently, we hold that Mrs. Koufman does not qualify for relief under section 6013(e). Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩